UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Afiyfah Muhammad, Darwin Wilson, and Dominique Skinner, *individually and on behalf of all others similarly situated*, Plaintiffs, -against- Alto Pharmacy LLC, Defendant. | Civil Action No. 1:23-cv-11315 (KHP) **EXHIBIT K** Index of Key Testimony May 8, 2026, Deposition of Michael S. Dinicola |

The full certified transcript of the May 8, 2026, deposition of Michael S. DiNicola, former Alto Pharmacy Area Manager, is annexed. The following index directs the Court to the passages most directly supporting Plaintiffs' Emergency Letter-Motion.

| # | Subject Matter | Transcript Cite |
|---|---|---|
| 1 | Witness identification — Michael DiNicola, former Alto Area Manager (2023–2024); supervised NYC couriers | 7:23 – 8:13 |
| 2 | The clock-out directive: "I was told to make sure that the punch-out, the clock-out matched the last delivery." | 30:3 – 30:5 |
| 3 | Directive confirmed as company-wide practice; management instruction, not witness discretion | 29:19 – 30:5 |
| 4 | Corroboration: "I was encouraged to have the time to punch-out match their last delivery" — attributed to Amy Stoute and Josh Howard | 78:2 – 78:13 |
| 5 | Witness acknowledged he lacked authority to disregard the Amy/Josh instruction | 78:14 – 78:19 |
| 6 | Slack as Alto's primary channel of company communication: "everything was done via Slack" | 44:7 – 44:9 |
| 7 | Verbatim admission: "most of the conversations that I had with anybody in the company, including couriers[,] was done through Slack or Onfleet or one of the websites" | 44:16 – 44:21 |
| 8 | Amy Stoute's membership in the NYC pharmacy Slack channel and issuance of directives via Slack | 70:1 – 70:23 |
| 9 | Manager-to-courier directive transmission specifically via Slack (reminders to "keep on top of" time and attendance) | 101:25 – 102:5 |
| 10 | Plaintiffs' counsel's on-the-record reservation of a supplemental request for all Slack communications between Amy Stoute, Josh Howard, and Michael DiNicola regarding time-and-attendance instructions | 102:7 – 102:14 |

**Note:** Page and line references are to the certified transcript (STENO.COM, Job No. 2707134).

Dated:  August 12, 2026
Brooklyn, New York

*/s/ Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.

1

# Deposition Transcript

Case Number: 23-11315
Date: May 8, 2026

In the matter of:

# Afiyfah Muhammad, et al. v Alto Pharmacy LLC, et al.

# MICHAEL S. DINICOLA



Reported by:
MELANIE STINSON-KONSTANTINIDIS

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO. 23-11315

AFIYFAH MUHAMMAD, et al.

Plaintiff,

-vs-

ALTO PHARMACY LLC, et al.

Defendant.

_____

TELECONFERENCE DEPOSITION OF MICHAEL DINICOLA

Friday, May 8, 2026
STENO
Aventura, Florida 33160
10:07 a.m. - 1:35 p.m.

Melanie Stinson-Konstantinidis, RPR

A-P-P-E-A-R-A-N-C-E-S:


On behalf of the Plaintiffs:
TYRONE BLACKBURN, ESQUIRE
T.A. BLACKBURN LAW, PLLC
1242 E 80th Street, 3rd Floor
Brooklyn, New York 11236
tblackburn@tablackburnlaw.com


On behalf of the Plaintiff:
KEVIN MAHONEY, ESQUIRE
249 E. Ocean Boulevard, Suite 814
Long Beach, California 90802
kmahoney@mahoney-law.net


On behalf of the Defendant:
LAUREN B. GRASSOTTI, ESQUIRE
JACKSONLEWIS
58 S Service Road ,#250
Melville, New York 11747
Lauren.Grassotti@jacksonlewis.com

MICHAEL S. DINICOLA                                          JOB NO. 2707134
MAY 08, 2026

                    MICHAEL DINICOLA                    5
DIRECT EXAMINATION BY MR. BLACKBURN                  5
CROSS-EXAMINATION BY MS. GRASSOTTI                 103
REDIRECT-EXAMINATION BY MR. BLACKBURN              120
RECROSS-EXAMINATION BY MS. GRASSOTTI               124

E X H I B I T S

EXHIBITS RETAINED BY COUNSEL


EXHIBIT D NOT MARKED

Exhibit A, Afiyfah's  Profile                      49
Exhibit B, Timekeeping Policy                      12
Exhibit C, Termination Email                       94
Exhibit E, February 16, 2024, Timesheet            62
Exhibit F, February 2, 2024  Timesheet             58
Exhibit G, April 17, 2024 Timesheet                67
Exhibit H, May 21, 2024 Timesheet                  71
Exhibit I, April 23, 2024 Timesheet                73

P R O C E E D I N G S

- - -

Deposition taken before MELANIE STINSON-KONSTANTINIDIS, RPR, Registered Professional Reporter and Notary Public in and for the State of Florida at Large, in the above cause: Whereupon,

MICHAEL DINICOLA,

having been sworn in, testified as follows:

DIRECT EXAMINATION

BY MR. BLACKBURN:

Q.   Good morning.  My name is Tyrone Blackburn.  I'm counsel for plaintiffs in that matter, including Ms. Muhammad, Mr. Wilson and, Mrs. Skinner.

We are here today to take your deposition.  This proceeding is being given under oath and carries the same force and effect as if you were testifying in a courtroom before a judge and jury.  That means you must answer each question truthfully and completely.

Everything that is said here is being taken down by a court reporter, so please listen carefully to each question.  Wait until

the question is finished and then answer out loud, so the reporter can make a clear record.

Please do not nod your head, shake your head or use gestures instead of words because the court reporter cannot take down gestures.  If you do not understand the question say so, and it can be rephrased.  If you need a break at any time, say so, and I will allow you to take one, but please answer any pending questions before we go off record.  Is all that clear to you?

A.   Yes.

Q.   Okay, perfect.  Is there any reason why you cannot testify honestly and truthfully today, by example, are you on any medication?

A.   No.

Q.   Okay.  Have you drunk any alcohol?

A.   No.

Q.   Before we begin, I want to just place a few additional items on the record specific to today's remote proceeding.

Can you please state for the record where you are physically located right now?

A.   My house, 69 Dongan Hills Avenue,

Staten Island, New York 10306.

Q. Is there anyone else present in the room with you physically or otherwise, who I cannot see on camera?

A. No.

Q. Are you receiving any assistance, communications, text messages, notes or other prompts from anyone during this deposition whether in person, by phone or text or through any other means?

A. No.

Q. Okay. Do you agree that you will not communicate with anyone including your attorney, if you have one, about the substance of any pending question during this deposition other than to consult about a claim of privilege?

A. Yes.

Q. Okay. You understand that although we are proceeding remotely, this deposition carries the full force and effect of an in-person proceeding and your testimony is under oath?

A. Yes.

Q. All right. Could you please state your full name for the record?

A. Michael DiNicola.

Q.   Okay.  Can you please spell your last name?

A.   D-I-N-I-C-O-L-A.

Q.   Okay.  Were you previously employed with a company named Alto Pharmacy?

A.   Yes.

Q.   What position did you hold at Alto Pharmacy?

A.   Area manager.

Q.   Okay.  And during what time period did you work there?

A.   It was in 2024, and I believe 2023.  I don't remember exactly when I was hired.

Q.   Were you the only area manager at that time?

A.   No.

Q.   Okay.

A.   When I was hired there were, I think, four others.

Q.   Do you remember their names?

A.   There was Jae.  I believe Joe might have been out in California.  I don't remember the girl's name in Denver.  So there were three others.

Q.   So, there's Jay like J-A-Y?

A.    J-A-E.

Q.    Oh, J-A-E.  Do you know Jae's last name?

A.    I think it was Gilead or Gilead.

Q.    And then Joe -- you mentioned a Joe?

A.    I believe his name was Joe out in California.

Q.    Is this like short for Joseph?

A.    I believe so.  I never asked his full name -- was Joseph.

Q.    Okay, no problem.  And then there is a Denver girl, but we don't know her name?

A.    Yeah, I don't remember her name.  She was only there for maybe a month or two after I was hired.

Q.    Okay.  I apologize for being -- I'm just taking a little bit of notes.

A.    That's okay.

Q.    Yeah.  In that role, were you responsible for supervising couriers in New York City?

A.    Yes.

Q.    Okay.  And what locations did you supervise, including whether you supervised couriers reporting to 100 Park Avenue in

Manhattan?

MS. GRASSOTTI:  Object to the form.

BY MR. BLACKBURN:

Q.   Okay.  You can answer.

A.   So I was New York, Long Island, and then later on it became Denver and Seattle.

Q.   So you went from -- so is it safe to say that your area expanded from New York to essentially almost the entire United States?

A.   Yes.

MS. GRASSOTTI:  Object to the form.

BY MR. BLACKBURN:

Q.   So, what Lauren just did was she stated an objection, so what I would say to you is, if you can just take a little pause since we are remote.  It's easier if we're in person, but since we're remote you can just wait like a second before answering, so Lauren can get whatever objection she wants on the record and then you are free to answer, okay?

A.   Will do.  Sorry about that.

Q.   No, that's okay.  Listen, you didn't know.  I should have told you that from before. I apologize.

During your employment, did you

have access to the WhenIWork timekeeping system for couriers?

MS. GRASSOTTI:  Object to the form.

BY MR. BLACKBURN:

Q.   You can answer.

A.   Yes.

Q.   Okay.  What permissions did you have with -- I'm sorry, let me rephrase that.

What permissions did you have in the WhenIWork timekeeping system?

A.   I had the ability to change times and approve hours.

Q.   Could you elaborate on the time-changing function of the WhenIWork timekeeping system?

MS. GRASSOTTI:  Object to the form.

BY MR. BLACKBURN:

Q.   You can answer.

A.   Okay.  So, I would be able to approve hours or change the hours.  If they finish before their three-hour shift, I would extend their time to the three hours and if they went over, if they forgot to clock-out, whatever the case may be, I would be able to go in and adjust times to when they actually finish the route.

Q.   When you say finish the route, could you explain what that means?

A.   When they completed their last drop unless they had a package that they had to bring back to the store.

Q.   Okay.  So the couriers -- okay, nevermind.  Let me just keep going.

So I'm going to display an exhibit.  It's going to be marked as Exhibit B.

MR. BLACKBURN:  Ms. Melanie, I think I may have dropped some of these exhibits into the Steno platform.  I don't know if you can see them there.

(Off-the-record discussion was held.)

(Whereupon,  Exhibit B, Timekeeping Policy was marked for identification.)

BY MR. BLACKBURN:

Q.   So, I'm now displaying Exhibit B on the screen for all parties to see.

Mr. DiNicola, can you see the document on your screen clearly?

A.   Yes.

Q.   Please let me know if you need me to enlarge any portion before I ask you questions about it.

MR. BLACKBURN:  Madam Court Reporter, this is going to be marked as Exhibit B.  I do have an Exhibit A, but I just want to start with Exhibit B now.

BY MR. BLACKBURN:

Q.    Mr. DiNicola, do you recognize this document?

A.    No, I don't remember it.

Q.    Do you see what it says on the top, courier timekeeping policy?

A.    Yes.

Q.    To the best of your recollection, were you ever given a copy of this policy or trained or its contents?

A.    Yeah, probably on my first day I was given this information, but I don't remember it.

Q.    Okay.  I'm going to read from the objective paragraph, the second -- the third sentence where it says Alto must keep an accurate record of time worked to calculate employee pay and benefits.

Did I read that correctly?

A.    Yes.

Q.    So the policy states that couriers must accurately record the time they begin and

end their work.

I believe that's located -- where -- let me -- right here, it says timekeeping.  Couriers must accurately record the time they begin and end their work.

Did I read that correctly?

A.   Yes.

Q.   Okay.  And then the second sentence says it will be the courier's responsibility to validate his or her time record to certify the accuracy of all time recorded.

Did I read that correctly?

A.   Yes.

Q.   The sentence under that says, the supervisor will review and then approve the time record before submitting it for payroll processing.

Did I read that correctly?

A.   Yes.

Q.   The policy does not say that supervisors may change or reduce a courier's time entry without the courier reporting an error, correct?

MS. GRASSOTTI:  Object to the form.

BY MR. BLACKBURN:

Q.   You can answer.

A.   Yes.

Q.   The policy states that in the event of an error in reporting time, the courier must immediately report the problem.

And that will be one, two, three, four -- the fourth sentence in the middle of the same timekeeping paragraph.

In the event of an error in reporting time, the courier must immediately report the problem.

Did I read that correctly?

A.   Yes.

Q.   The enforcement section of this document says, the policy states that altering, falsifying, tampering with time records or record -- recording time on another employee's time record may result in disciplinary action up to and including termination of employment.

Did I read that correctly?

A.   Yes.

Q.   So, did anyone at Alto ever tell you that you were permitted to change a courier's time entry without the courier first reporting

an error?

A.    Yes.

Q.    Who was that?

A.    I believe the first one to tell me, that was my second boss, who was Amy.

Q.    What's Amy's last name?

A.    I don't remember it off the top of my head.

Q.    And how did you communicate with Amy?

A.    Everything was done via the laptop whether it be communication through Slack or Zoom meetings.

Q.    Do you know Amy's title?

A.    I don't remember what her title was.

Q.    Was Amy the only supervisor that you reported to?

A.    Until -- after her was Josh Howard.

Q.    Do you remember Josh's title?

A.    No.  He originally was -- I believe he was in HR or the recruiting and then he took over Amy's position when she moved to another position.  I believe that's how it worked.

Q.    So when Amy moved on, did Josh reinforce the same directive to alter the courier's time records?

MS. GRASSOTTI:  Object to the form.

BY MR. BLACKBURN:

Q.   You can answer.

A.   Yes.

Q.   I'll take them each separately.  To the best of your recollection, what was Amy's instruction to you?

A.   To make sure that the clock-outs matched the time of the last delivery.

Q.   Did she explain to you why?

A.   Cost cutting, so we didn't have to pay the drivers additional time.

Q.   And she said that to you specifically?

A.   Yes.

Q.   And did you have the option of not following Amy's directive?

A.   No.

Q.   Were you afraid of being terminated if you failed to follow Amy's directive?

MS. GRASSOTTI:  Object to the form.

BY MR. BLACKBURN:

Q.   You can answer.

A.   Afraid, no, but I knew I would be.

Q.   Were there any bonus incentive structures offered to you if you cut costs as

you just described?

A.    No.

Q.    So to the best of your knowledge, were you the only area supervisor that was provided this directive by Amy?

A.    Was I the only one, no.

Q.    Okay.  So who else was provided this directive by Amy?

A.    All the area manager at that time, which would include Jae and Joe out in California.

Q.    Did you understand this as being a company directive, a company-wide directive?

A.    Yes.

Q.    Okay.  And where was Amy seated?

A.    What do you mean seated, you mean her location?

Q.    Yes.

A.    I believe she was in California.

Q.    Was she, to the best of your knowledge, was she located at the corporate headquarters?

A.    I don't think so.  I think she was in southern California.

Q.    Where do you understand the corporate

headquarters to be located?

A.   I believe that they were up in the San Francisco area where they started.  Then next one was in, I believe, Dallas.

Q.   Did you ever have to travel to California for any in-person trainings?

A.   California, no.  I flew to Dallas one time.

Q.   Okay.  And when was that?

A.   I don't know exactly when.  It was about a month after Amy took her position.

Q.   Okay.  And what was the basis of that training?

MS. GRASSOTTI:  Object to the form.

BY MR. BLACKBURN:

Q.   You can answer.

A.   It was for a training for the area managers.

Q.   Do you recall anything specific that stood out to you from that training?

A.   Besides not really spending any time with Amy, no.

Q.   Sorry, I didn't expect that.

Earlier you mentioned that Josh Howard also reinforced this same sentiment.  Can

you do the best of your recollection, tell me

what Mr. Howard instructed you to do?

            MS. GRASSOTTI:   Object to the form.

BY MR. BLACKBURN:

      Q.    You can answer.

      A.    He reiterated that we have to make

sure that the clock-outs and the last deliveries

matched.

      Q.    One second.  Same question as before

regarding Amy as it concerns Josh.  Did you feel

that you had the ability to not follow Josh's

directive as it pertains to cutting costs?

      A.    No.

      Q.    Did you believe that if you went

against Josh's directive that you would have

lost your job?

      A.    Yes.

      Q.    Why did you believe this?

      A.    Why did I leave the position?

      Q.    No, no, no, I'm asking what led you to

that belief.

      A.    It just came with the job.  If I

wasn't -- that was -- one of my responsibilities

was to make sure that timekeeping was accurate.

      Q.    Accurate in accordance to the

directive that was provided to you by Amy and Josh, correct?

A.    Correct.

Q.    To the best of your recollection, did Amy ever state that the reduction of time entries was to keep in line with a specific budget?

MS. GRASSOTTI:  Object to the form.

BY MR. BLACKBURN:

Q.    You can answer.

A.    Not as specific, but she said we had to keep cost down.

Q.    Did she provide you -- and again, did she provide you with any reason as to why you guys are to keep cost down?

A.    No, she never gave us specific reasons as to why.

Q.    Did she ever share with you that she was receiving this directive, therefore she's now pushing that directive on to you?

A.    Yeah, she was told that -- she told us that she was told that this is what we needed to do.

Q.    Did she ever state who told her that?

A.    No.

Q.   What about Josh, did Josh ever advise that the hours and time should be reduced in order to keep within a specific budget?

MS. GRASSOTTI:  Object to the form.

BY MR. BLACKBURN:

Q.   You can answer.

A.   Again, he was just concerned with keeping the cost down.

Q.   What about overtime exposure, did you ever have any conversations with Amy and Josh regarding the reduction of overtime?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Yes, I remember.

BY MR. BLACKBURN:

Q.   Go ahead, you can finish.

A.   Amy said that we were trying to eliminate overtime altogether.  That was the goal.

Q.   Did Josh also express that same thing?

A.   Yes, but not as forcefully as Amy.

Q.   I'm sorry, give me one second.

At any point in time during your employment when reviewing time records -- sorry, let me rephrase that.

During your employment, did you

have to meet with Amy to go over the costs from your area?

A.    Yes.

Q.    How often?

A.    Going over the specific numbers and what we are doing, probably once a month.

Q.    Okay.  And what would be the focus of those discussions?

A.    The amount of drops on each route as well as the time for each route -- or, yeah, the time.

Q.    Were you provided any directive from Amy concerning some of the -- let me rephrase that.

What was some of the directives given to you by Amy during these meetings?

MS. GRASSOTTI:  Object to the form.

BY MR. BLACKBURN:

Q.    You can answer.

A.    To increase the number of drops on each route while reducing the amount of time drivers spend over their shift limit.

Q.    Did you explain to Amy that the store is located in Manhattan?

A.    Yes, and that was a struggle was

letting them know where we were.  We did make adjustments on the shift when we start brought drivers in, but that was one of the things that we worked on.  But it was always increasing the number of drops while reducing the amount of -- if you want to call it overtime.

Q.   Okay.  And what kind of adjustments did you make to the drivers' time?

A.   I believe they -- we moved the -- if I remember correctly, we moved the shift up a half hour to allow the drivers to get out a half hour earlier, and actually be on the road making deliveries during our delivery window.

Q.   What adjustments did you make to ensure that the overtime was reduced?

MS. GRASSOTTI:  Object to the form.

BY MR. BLACKBURN:

Q.   You can answer.

A.   We added more bikers in certain areas of Brooklyn and Queens to reduce the number of cars that we had out there because the bikers would be able to take more packages than the cars.  That was the main way of reducing the head count and increasing the drop point or the average drops.

Q.    So when you made this adjustment, how many couriers did you have in total?

A.    I think in New York we had between bikers and cars, we had about 100 and -- 100 I believe, between 75 and 100 on our roster.

Q.    And when you left Alto, how many couriers did you have at that time?

A.    Much less than that.

Q.    Okay.

A.    The last month that I was there -- my last two months that I was there as we were -- as a driver would leave, we wouldn't replace them, we would just go with what we had.

Q.    Okay.  So to the best of your recollection, what was the average number or the amount, the total amount?

A.    I would say we were between 50 and 75.

Q.    What month did you leave again?

A.    I believe it was July of 2024.  I don't remember the exact month that it was.

Q.    Okay.  And on average, how many hours per week were these -- were those 50 to 75 drivers clocking?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  It would range from

anywhere from 15 for the week to a full 30, 36 hours, depending on how many shifts they picked up.

BY MR. BLACKBURN:

Q.   And during that time were you still editing the time records?

A.   Yes.

Q.   So when Josh took over -- sorry, hold on -- Josh, right, yep.  Okay.

So when Josh took over for Amy, did he also continue the policy of having monthly reviews of the cost from your area?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Yeah -- sorry.

BY MR. BLACKBURN:

Q.   No, go ahead.

A.   Yes, if not, more frequently than once a month.

Q.   So how frequent was his meetings?

A.   We would talk on a weekly basis, but he would bring that up on a weekly basis, as well as when we talk about other things.

Q.   So, what were the things that you guys were talking about on a weekly basis?

A.   The scheduling, the shifts, all four

locations between New York, Long Island, Seattle

and Denver.  Our staffing, if we had enough

drivers, if we were going to be getting more

drivers.

Q.  Okay.  And the same question as before

for Amy, did Josh ever express to you that he

was receiving any kind of pressure from above to

implement these cost-cutting measures?

MS. GRASSOTTI:  Object to the form.

BY MR. BLACKBURN:

Q.  You can answer.

A.  Yeah, he made it sound -- he made it

known that this is what he was being told to do.

Q.  And did he ever share with you who

told him to do this?

A.  No.

MS. GRASSOTTI:  Object to the form.

You can answer.

THE WITNESS:  Oh no, he never told me.

I'm sorry.

BY MR. BLACKBURN:

Q.  One second.  Did you ever have to go

over the time records with Josh?

A.  Yes.

Q.  Okay.  And what do you recall from

those conversations?

A.   He would spot-check once in a while and he will find a route maybe from the day before where somebody clocked-out long after their shift ended and he would reach out to me in the morning and we would discuss what happened, why they did it, was it a simple accident, mistake, and then we would discuss about making sure that we got to make sure that doesn't keep happening.

Q.   Did Amy ever do that with you?

A.   Yes.

Q.   And what was her -- well, sorry, let me rephrase.  How frequent did she do that?

A.   I would say a couple of times a week I might get a message saying, hey, take a look at this one.

Q.   And what will be the instruction to resolve the issue?

A.   Take a look at the route, see why the route ended so late, and if it was something that I needed to reach out to the driver, I would reach out to the driver and find out why, what happened to that route.  And then I would go back to Amy with whatever that explanation

was and adjust the times, if needed.

Q.   Was there ever a time where you were instructed by either Amy or Josh to reduce the driver's time, despite whatever the driver may have given as a reason for the clock-out time?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  No, I don't remember that.  I don't remember them ever telling me to reduce somebody's hours before the last delivery was made.

BY MR. BLACKBURN:

Q.   No, no.  So, I guess I have to just rephrase -- clean up the question again.

So it's not before the last delivery.  I'm talking about the time that was evidenced on the time record, right, the day the driver punched out with.  Even if it's after the last delivery.

So the question is:  Was there ever a time where Amy or Josh raised the concern with a specific -- or any driver's punch-out time and instructed you to make the correction to the driver's records without you having to go back and speak to the driver to learn why the punch-out time was what it was?

A.    Yeah, all the time.

Q.    All the time?

A.    I was told to make sure that the punch-out, the clock-out matched the last delivery.

Q.    And how would you know what time was the last delivery?

A.    We would find that information on Onfleet.

Q.    What is Onfleet?

A.    Onfleet was the routing software that we used.

Q.    Okay.  So was there any other software that you used?

A.    When it came to that, no.

Q.    So, we have been talking a lot about the amendments to the punch-out time.  Did you ever amend the clock-in time?

A.    No, I mean, a driver might call up and say, hey, I forgot to punch-in, can you punch me in?  But drivers were not able to clock-in early.

Q.    So, were you instructed to change the time based on this program that we just discussed regarding Amy and Josh, as opposed to

the actual driver punch-in time to reduce hours?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Yes, I was instructed to use Onfleet.

BY MR. BLACKBURN:

Q.  Okay.  And describe to me what happens when a driver appears at work, so like what's that process like?

A.  So in New York they would show up. Most of the times they would be waiting outside until their route was complete.  Whatever time the route was to begin, that's when they would punch-in.  They would either take the route and go or they would have to wait around and wait for that route to be completed, this way they can take it and go get on the road.

Q.  And the time that they were waiting for the route to be assigned, are they punched-in or are they punched-out?

A.  They're punched-out.  If they showed up early, they were punched-out.

Q.  Okay.  And did they have the freedom to make deliveries for, let's say, Grubhub during that time that they were waiting to receive their route or did they have to wait

until you guys assigned them a route?

A.    If they were clocked-in, they were not allowed to work for any other delivery service.

Q.    Okay.  If they were clocked-in, were they allowed to, you know, stop off and check on their mom, if mom is in the hospital sick on the way to the route or they were considered on the clock with Alto, so just Alto business alone?

A.    Policy alone, company would want us to tell them to keep it moving.  But personally, yeah, we would let them veer off.

Q.    So the policy --

A.    The policy --

Q.    Okay, go ahead.

A.    Policy-wise, it was, if they were on the clock, it's strictly Alto.

Q.    So, if they showed up for their scheduled time, but let's say medication is not ready, would they still be required to wait before clocking-in?

A.    No, if the shift started, let's say, 12:30 and they had to wait until 12:45 for that route, they were allowed to punch-in at 12:30, at the start of that shift.

Q.    But would that time ever be amended

based on the Onfleet system that you spoke about earlier?

A.   No.

Q.   Just to revisit this one more time. The couriers whose shift were reduced, none of them ever gave you explicit authorization to reduce their time, correct?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  No, no.

BY MR. BLACKBURN:

Q.   Did any of them protest the reduction of their time?

A.   Not that I can recall.

Q.   Okay. Did anyone ever question why their hours were reduced?

A.   Not that I can recall.  I don't remember anybody complaining about that because they all knew that they got paid until their last drop.

Q.   Let me continue on.  Did the dispatchers ever have the ability to alter or reduce the courier's time?

A.   I believe they had the ability to.

Q.   Okay.

A.   I believe so.

Q.   And who provided them with that authority?

A.   That would have come from Amy or whoever is above us because I do remember drivers would say, hey, can you -- I forgot to punch-in, can you punch me in, or they couldn't log-in for whatever reason and then the dispatcher would clock them in.

Q.   Okay.  Were the dispatchers in a role of authority like a supervisor?

A.   When it comes to the couriers, yes.

Q.   So, what time did the location at -- I think it's 100th Park Avenue, if I am correct -- what time did that location close?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  I believe they closed at -- I don't -- 7:00 o'clock or 8:00 -- I think 7:00 o'clock.

BY MR. BLACKBURN:

Q.   To the best of your recollection, was there ever any time that a courier was in the process of making a delivery, but couldn't make it back in time to the location before it closed?

A.   Yes.

Q.   So, suppose that courier had medication that was left over from their routes for that day, how would they be able to bring that medication back to the pharmacy if the pharmacy is closed?

A.   We have remote locks on the door, so when they got to the store, the dispatchers would see the driver at the store through the cameras, they would open the door for the driver, the driver would go in, drop the medication in our Dropbox and then leave the store, and then the dispatcher would lock the door behind the driver when they left.

Q.   Was there ever a point in time when that process was not implemented with any of the drivers?

A.   Yeah, before we had -- we didn't always have the box in the location.

Q.   So, at what point in time did you get the box in the location?

A.   I believe it was a few months after I started.  I don't remember exactly when it was, but I do know that we didn't have it when I started.

Q.   So, what was the process like before

the box arrived?

A.    If they didn't get back in time, I believe it was bring the package with you and bring it back to the store the next day.

Q.    So the drivers would be required to take the packages of these medications home with them?

A.    I believe that that's how it went.

Q.    Were the drivers compensated for bringing the packages home with them?

A.    No.

Q.    So, they had to punch-out even though they were bringing home this medication?

A.    Yes.

Q.    Okay.  And was any of the medications narcotics that they had to bring home with them?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  I don't remember.  I can't say yes or no to that.

BY MR. BLACKBURN:

Q.    Could the medication have been narcotics?

A.    Yeah, it definitely could have been some type of a class -- of a narcotic.

Q.    And were the drivers provided any kind

of instruction on how to monitor or safe keep
the medication when they had to bring the
medication home?

        A.    Regular medication, I don't believe
so.  They were told how to keep refrigerated
items and what they had to do with that, if they
had to bring it back home.

        Q.    Okay.  And what was that instruction?

        A.    It would have to go into their
refrigerator at home.

        Q.    And would these drivers have to
attempt to deliver these medications that they
brought home before they -- well, on their way
back to the pharmacy the following day, before
the beginning of their next shift?

        A.    I don't remember off the top of my
head, but I wouldn't be surprised if we did have
a driver drop something off the next day,
depending on what that medication was, but I
can't definitely say, yes, that we had somebody
do that.

        Q.    Okay.  And if that was the case, how
was that driver compensated?

                MS. GRASSOTTI:  Object to the form.

                THE WITNESS:  It would be -- they

would clock-in when they left the house to go to that delivery.

BY MR. BLACKBURN:

Q.   Based on the software that you mentioned earlier that tracks the route of the drivers, is that the time you would pay a courier for or would they be paid based on whatever they actually clocked-in or out?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  For the clock-in, we didn't use the software unless it was one of those off cases where they were dropping it off in the morning.  But the software was only used for punch-outs.

BY MR. BLACKBURN:

Q.   So, you just mentioned a caveat there where you said one of those off cases where they would drop the packages off in the morning.  So, you are referring to the leftover package that they brought home with them, correct?

A.   Correct.

Q.   So then they would have to log-in into the software and then drive to that drop-off on their way to Alto, and the software would then monitor -- or capture I should say -- that

drop-off from the night before?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Yeah, it would track them from when they started until when they finish it.

BY MR. BLACKBURN:

Q.   So, if a driver would have stayed clocked-in from the night before from a package that he or she could not have completed, and then delivered the package the following morning, using the software that you mentioned earlier, would that driver have been paid for that entire window of time, from the time they brought it home to the time that they actually made the delivery the following morning?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  No, they wouldn't have gotten paid for that.

BY MR. BLACKBURN:

Q.   Why?

A.   Because according to the company they would have been off -- not have a route.  So, they would have made -- they would have had made clock-out at that last drop from the night before and then start again the next morning

when that driver left to go make that delivery.

Q.   Okay.   And what would be the starting point that the driver would receive credit for? So here's an example.  Let's say the driver lived in Brooklyn, the drop-off is in the Bronx. And he starts his route from his home in Brooklyn to make that drop-off the following morning in the Bronx.

Is he allowed to clock-in with that route tracker from his home in Brooklyn and, I guess, when he gets to the customer's home in the Bronx and they scan the package to confirm the delivery, would that window of time be considered his time of work or would you have adjusted it.

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  No, the driver would have gotten paid for the entire route from the second they left the house to the second they finished the route or made that drop.

BY MR. BLACKBURN:

Q.   Okay.  Do you know if the company kept records of who and/or when a courier took medication home?

A.   No.

Q.   So, how would the drivers of the couriers notify you that they had a package that they had to take home?

A.   They would have reached out to the dispatcher and said, hey, I have a package. They would let them know which was the failed package and that they had to bring it home.

Q.   Okay.  And would the dispatchers instruct them to bring it home?

A.   If they couldn't get the package back in the pharmacy, yes.

Q.   And earlier you said that the dispatchers had the authority as a supervisor, over these couriers, correct?

A.   In a capacity, yes.

Q.   Okay.  So the couriers could not refuse to bring the packages home, correct?

A.   No, no.

Q.   Okay.

A.   If they did refuse, they probably wouldn't have driven for us again.

Q.   Meaning, that if they have refused to bring the packages home with them, that you guys would have more than likely terminated them,

correct?

MS. GRASSOTTI:  Object to the form.

BY MR. BLACKBURN:

Q.   Go ahead.

A.   Yes, they would have ended the contract with them.

Q.   So, would the dispatchers keep track of which couriers took medication home?

A.   When we had to, yes.

Q.   And how would they keep track of that?

A.   They would be notified in Slack with the channels with the pharmacy and then a drop point would be created for the next delivery for the next day.

Q.   You mentioned Slack channels with the pharmacy, and channels as in plural, meaning, more than one channel?

A.   Yeah, we usually had a channel set up with each pharmacy across the country.  So we had a New York, Long Island Channel, this way it kept everything organized.

Q.   Okay.  And within the New York channel, were this like sub-channels between like, let's say, you, Amy, Josh and the dispatchers?

A.    Yes, we did have our own channel.

Q.    And within your, I guess, supervisor's and management channel, were there ever discussions regarding the couriers?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  No, those conversations usually took place in our weekly or bi-weekly meetings face-to-face.

BY MR. BLACKBURN:

Q.    Did Amy or Josh ever provide instruction regarding cost-cutting measures within those Slack conversations?

A.    I'm sure there might have been some comments like messages saying, hey, try to keep the overtime down or whatever the case.  Well, we see that your numbers are going up.  But when it came to the -- really the directive of what we're doing and how they want processes done, our policy that was done through Zoom meetings face-to-face.

Q.    Did these channels have any specific names?

A.    No, only the -- the only ones that I remember having names are the ones that were with each pharmacy, New York, Long Island,

Denver, Seattle.

Q.   Okay.

A.   But any channel between us and me and the other area managers or with Amy, anything else, that was just like a group chat-type of channel, it didn't have a name.

Q.   And that would be all on Slack, correct?

A.   Yes, everything was done via Slack.

Q.   During your employment, did they provide you with a company phone?

A.   Phone, no.  I just got a laptop.

Q.   Okay.  And you would have to use your own cellular device to communicate, correct?

A.   If I did -- but everything was done through -- even most of the conversations that I had with anybody in the company including couriers was done through Slack or Onfleet or one of the websites.  Very few times that I get on the phone and speak with anybody, including Amy or Josh.

Q.   Okay.  So I just have to get it out. WhatsApp, was that an app that you ever used to have conversations with Amy or Josh or anybody else?

A.   No, no, no.

Q.   What about Signal?

A.   No.

Q.   Okay.  Regular text messages?

A.   Maybe Josh, but I don't recall.  I think -- I'm pretty sure -- I remember most of my conversation -- all of my conversations being through Slack.

Q.   So earlier I asked you would the dispatchers keep track of which couriers took medication home, and I think you said that they would create a ticket or something?

A.   They would create a new drop in Onfleet.

Q.   In Onfleet, okay.  And in the Onfleet app, did the app monitor when these new tickets were created?

A.   Yeah, yeah.

Q.   Was it given a specific title, was it like a specific title function?

MS. GRASSOTTI:  Object to the form.

BY MR. BLACKBURN:

Q.   Go ahead.

A.   No, you just create the tag or the ticket, whatever it's called, but there was

never a name to it like we never -- it just --
for the next day, it was just another delivery
along with all the other ones.

Q.   So, it wouldn't be like color
coordinated to show the greens were from this
day and a yellow would be from yesterday?

A.   No.   Once that ticket would have been
made, they were all the same color, they all
blend together.   It's now it's just another
delivery amongst all the others for that day.

Q.   Okay.

A.   The only difference with that one
would probably be it would show at the time for
the delivery would be early in the morning
before the regular delivery window.

Q.   The regular delivery window was?

A.   I believe it was either 12:30 to
3:30 or maybe 1:00 to 4:00.

Q.   Then you would have another delivery
went in the evening?

A.   Yes, then there was another three-hour
window later on in the day.   Again, I think that
was 6:00 to 9:00 or 10:00 to -- 6:00 to 9:00 or
7:00 to 10:00 maybe.   I don't remember exactly
what those hours were.

Q.   So, if we were to pull the records from Onfleet to see when the tags were created and we were to see a delivery scheduled before, let's say 12, 00 on any particular day, would that be an indication that that delivery was a leftover from the night before?

A.   Before we had the Dropbox in the pharmacies, yes.

Q.   So this Onfleet app, would it allow the drivers to login if they were not at the pharmacy?

A.   No, clock-in was done through a different app.  Punch-in and out was done through a different app.

Q.   Do you know what that was?

A.   WhenIWork.

Q.   So, again, same question for this app then, were the drivers allowed to clock-in to work if they weren't -- well, sorry, let me rephrase.

Would the WhenIWork app allow the drivers to clock-in if they are not physically at the pharmacy?

A.   No, there was a 50-foot geo-fence around the pharmacy.  They had to be within

50 feet of the store.

Q. So, if that's the case then, how would a driver's time be accurately calculated if they were delivering a package that was left over from the night before, before the beginning of their new shift the following day?

MS. GRASSOTTI: Object to the form.

BY MR. BLACKBURN:

Q. Go ahead.

A. That's when we would use Onfleet to see when that delivery started. So the driver would say, hey, I'm going to leave -- I'm leaving to go on this route or to make this drop. Once they start that delivery in Onfleet, we know what time they started and then the time will be entered into for them.

Q. Does Onfleet provide you with the Geo-location, I guess, of where the driver physically was at the time that they entered, that they started this delivery on for that particular customer?

A. Yes.

MR. BLACKBURN: I'm just checking over my notes. I think I may have skipped ahead and asked a lot of questions that I had

planned to ask you already.  I want to make
sure that I don't miss anything.  Hold on
one second.  Okay, let me see.  So, I'm
going to share my screen again and now I'm
going to display Exhibit A.  Okay, one
second.

(Whereupon,  Exhibit A, Afiyfah's  Profile was
marked for identification.)

BY MR. BLACKBURN:

Q.   So, do you see what's marked on the
screen as Exhibit A?

A.   Yes.

Q.   So, what is Exhibit A?

A.   It looks like it's Afiyfah's profile.

Q.   Okay.  And is that her employee ID
profile?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Yeah.

BY MR. BLACKBURN:

Q.   So, to the best of your recollection
Alto assigned employee ID numbers to couriers
upon their hire, correct?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  I don't remember that.

BY MR. BLACKBURN:

Q.   What?

A.   I don't remember them having employee ID numbers, but if they did, then they did.

Q.   Did you have an employee ID number when you worked for Alto?

A.   I'm sure I did.

Q.   What about the dispatchers, to the best of your recollection?

A.   Yes.

Q.   The couriers, did they have employee ID numbers as well?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  I guess so --

BY MR. BLACKBURN:

Q.   Go ahead.

A.   I assume that they wouldn't have had ID numbers, but I guess they did.

Q.   Did Alto require new couriers to attend mandatory orientation or training before beginning to work?

A.   I believe they had to do some time of online training or seminar or something.

Q.   I will remove this.  Sorry.

Were couriers paid a fixed hourly

rate of $21.50 per hour?

A.   Yes.

Q.   And were couriers paid through Alto's ADP payroll system?

A.   That, I don't know how they were paid.

Q.   Okay.  Would they provide an invoice?

A.   I would assume so.  I don't know.

Q.   Are you aware if they received a paycheck?

A.   I know they got paid.

Q.   Were the couriers allowed to negotiate their hourly rate with Alto?

A.   No.

Q.   It was a take it or leave it?

A.   Yes.

Q.   Aside from customer tips, couriers could not set their own prices or increase their earnings by charging customers directly, correct?

MS. GRASSOTTI:  Object to the form.

WITNESS:  Correct.

BY MR. BLACKBURN:

Q.   You can --

A.   Correct.

Q.   Okay.  Did Alto reimburse couriers for

bridge and tunnel tolls incurred while delivering prescriptions?

A.   Yes.

Q.   At the 100 Park Avenue site, were couriers expected to arrive before their routes were dispatched?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Yeah, they were expected to be there at least 15 minutes early.

BY MR. BLACKBURN:

Q.   So while they were waiting to be dispatched, couriers were on Alto's premises, right?

A.   Technically, no, they would be waiting somewhere down the block.

Q.   Okay.  But they will be under Alto's control, correct?

A.   Yes.

MS. GRASSOTTI:  Object to the form.

BY MR. BLACKBURN:

Q.   They weren't really free to leave, correct?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  As long as they were back for the 12:30 in the start of their

shift, they could have went somewhere, but once they are there, they are there until their route starts.

BY MR. BLACKBURN:

Q.   Okay.  So I'm going to ask you a couple more questions regarding the editing of time records.  Approximately, how often did you edit a courier's clock-in or clock-out time?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Clock-in, very rarely. Clock-outs did happen on a weekly basis. They were edited -- edits to drivers' times.

BY MR. BLACKBURN:

Q.   It would be weekly or daily?

A.   Well, the hours would be submitted weekly, but our check, I was doing it on a daily basis for the day before.

Q.   Okay.  So, let's say they logged in time for a Monday, but then on Tuesday, you would go back and edit the times?

A.   If needed, yeah.  I would usually approve the hours from the day before the next day, this way it doesn't pile up on me at the end of the week, and then I would submit those

hours once a week.

Q.   Okay.  And for the 15 minutes that the couriers were waiting, that you required them to come in 15 minutes earlier, were they paid for that wait time?

A.   No.

Q.   Okay.  And when they were in training, were they paid for the training?

A.   I don't think they were paid for that.

Q.   But you are not 100 percent?

A.   No, I'm not.

Q.   So, they could have been paid for the training?

A.   They could have been paid for the hour or two for that training, whatever that is, but I don't know what that -- if they did or not.

Q.   So, let's go back to -- so on the WhenIWork system where you made the edits to the couriers' time, did you have to enter a reason for the edits you made?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  No.

BY MR. BLACKBURN:

Q.   Did you ever separately document the reasons for the edits in either email, Slack,

payroll notes or any other system?

A.   No.

Q.   Did you ever notify the couriers whenever you changed their recorded time?

A.   Only if it was an extreme amount of time.

Q.   When you say extreme, what are you referring to?

A.   Half hour, an hour after that last delivery.

Q.   Okay.  Were couriers able to clock-out of the WhenIWork system if they were, let's say, in the fields?  Because remember you said they were Geo something -- I forgot the phrase that you used, concerning when they would be able to clock-in.

A.   Yeah, they had a Geo-fence for clocking-in.  They could clock-out.  Anyway, there was no limit on where they were when they clocked-out.

Q.   Okay.  And just to be clear, Alto -- did Alto require approval from anyone above you before you changed the workers' times -- I am sorry -- time entries?

A.   For each individual time change, no.

Q.   So, back to the training real quick. Did you ever do the training or review the training requirements?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  No, I don't remember ever seeing what the training material was.

BY MR. BLACKBURN:

Q.   Okay.  But did you ever provide the training to the workers -- well, to the couriers?

A.   No, that was all done through HR and WhenIWork, they handled all that.

Q.   So how did you guys keep track of knowing when a courier completed their training?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  If I remember correctly, they couldn't start their first shift without completing the training.  I think it was all linked together.

BY MR. BLACKBURN:

Q.   Okay.  And was that training documented -- well, sorry, let me rephrase.

The completion of the training, was that documented on the WhenIWork system or through a separate HR system?

MS. GRASSOTTI:  Object to the form.

BY MR. BLACKBURN:

Q.   Go ahead.

A.   I think it was the WhenIWork system.

Q.   To the best of your knowledge, and you may not know this, but I am going to ask anyway, did Alto provide WhenIWork with a rubric for what needed -- what the requirements were for the training programs for the couriers?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  I believe they made recommendations of what we needed from the drivers, but whether or not that was set in stone and part of that contract, I don't know.

BY MR. BLACKBURN:

Q.   Now was this training area-specific because I know that you initially was in New York and then you took on Denver and other places -- was that area-specific?

A.   I don't think so.  I think all drivers in all cities had to do that before starting their first shift.

Q.   Okay.  And as part of that training, were -- sorry, I'll withdraw that.

And to the best of your understanding, do you know how long the courier would have to sit through the specific trainings?

A.   From what I remember, it wasn't very long.  An hour or two maybe, if I remember correctly.  It wasn't very long.

Q.   Okay.  So I'm going to display another exhibit.  It's a little wonky -- my exhibits.  My questions are not in line with the alphabet, so -- but I assure you every exhibit is going to be gone through but, you know, this is going to be Exhibit F.  This is just how it's written in my chart.  I apologize, but this section came before in my outline, but I'm going to display it now.  Don't think I'm crazy.  I'm just going to put this up real quick.

(Whereupon,  Exhibit F, February 2, 2024 Timesheet was marked for identification.)

BY MR. BLACKBURN:

Q.   One second.  So, do you see what's marked as Exhibit F?

A.   Yes.

Q.   So, to the best of your understanding, what is Exhibit F?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Is that -- let's see.
That looks like a clock-in and out for
the -- from WhenIWork.

BY MR. BLACKBURN:

Q.  Okay.  So according to Exhibit F, the entry history shows that on Friday, February 2, 2024, Ms. Muhammad clocked-in at 12:11 p.m. and clocked-out from mobile at 5:24 p.m. and then it shows scheduled at 5 -- sorry, 3:45 p.m.; is that correct?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Yes.

BY MR. BLACKBURN:

Q.  The entry history then shows that on Monday, February 5th, 2024, there are two edits identified as edited by Michael DiNicola at 9:58 a.m.  One changing out the time to 3:26 p.m. and the second changing it to 3:36 p.m.; is that correct?

A.  Yes.

MS. GRASSOTTI:  Object to the form.
There's no year on this document.

MR. BLACKBURN:  No, no, listen, you're definitely correct.  And I didn't -- I'm

not asking about the year.  I'm asking a
very specific --

MS. GRASSOTTI:  Well, you represented
that it was from 2024.

MR. BLACKBURN:  Okay.  Well, I will
share with you that this is from February
of 2024, but if you want we can get these
records from WhenIWork, which I think we
are in the process of getting and we will
be able to confirm that that is the correct
year, but your objection is noted for the
record.

BY MR. BLACKBURN:

Q.   The Michael DiNicola that's identified
on this document, is that you?

A.   Yes.

Q.   And you made both of those edits on
February 5th, correct?

A.   I guess so, yeah.

Q.   So why did you reduce Ms. Muhammad's
recorded clock-out time from 5:24 p.m. to 3:36
p.m.?

A.   Without remembering it, I'm assuming
that that was because that's when the last drop
was made.

Q.   And did Ms. Muhammad contact you to report an error in her time entry?

A.   No, not that I can recall.

Q.   To the best of your recollection, did Ms. Muhammad ask you to make that change?

A.   Not that I can recall.

Q.   Okay.  And to the best of your recollection, was there any written record in WhenIWork, Slack, email or otherwise from her indicating her original clock-out was wrong?

A.   I don't recall any of that.

Q.   Did you verify with her before reducing her recorded hours?

MS. GRASSOTTI:  I just want to object again, sorry.  There's also no indication on this screenshot that you have marked as Exhibit F indicating who it belongs to in terms of which courier's time this relates to.  The only one is Mike DiNicola.

MR. BLACKBURN:  Okay, no problem.  I will make the representation that this is the entry history for Ms. Afiyfah Muhammad and this was provided to the defendants as part of her disclosures in discovery, but we can confirm that again when we get the

records from WhenIWork.

BY MR. BLACKBURN:

Q.    All right, Mr. --

MR. BLACKBURN:  And your objection is noted for the record.

BY MR. BLACKBURN:

Q.    So earlier today you mentioned that if there was a, let's say, large edit to an employee's time records, that you would typically notify them or contact them regarding that.  So, in this example, there's a reduction from 3:36 p.m. to -- no, I'm sorry -- from 5:24 p.m. to 3:36 p.m.

Did you contact Ms. Muhammad to inform her that there would be an hour plus reduction in her time for this particular day?

A.    I don't remember.

Q.    Okay.  And typically would you have contacted her to inform her of that reduction in time?

A.    Not if -- honestly, this is showing that the delivery was made at 3:26.

Q.    Okay, no problem.  So I'm going to share another exhibit.  Exhibit E.

(Whereupon,  Exhibit E, February 16, 2024,

Timesheet was marked for identification.)

BY MR. BLACKBURN:

Q.   So I'm now displaying Exhibit E on the screen for all parties.

Mr. DiNicola, can you see this document clearly?

A.   Yes.

Q.   Please let me know if you need me to enlarge any portion before I ask you any questions about it.

A.   No, it's good.

Q.   Okay.  Do you recognize this document?

A.   Yes.

Q.   What is this document?

A.    It's another clock-in and clock-out.

Q.   Okay.  And according to this exhibit, the entry history shows that on Friday, February 16th.  And I'm going to represent to you that this is another screenshot from the time records of Ms. Muhammad.  And I'm also going to represent, that this is the screenshot from her time history in 2024, and that we provided these documents over to the defendants as part of our discovery disclosures, document disclosures. but I'll carry on with my question.

The entry history shows that on Friday, February 16th, 2024, Ms. Muhammad clocked-in at 12:14 p.m. and clocked-out from mobile at 5:53 p.m. scheduled at 3:45 p.m.

Did I read that correctly?

A.   Yes.

Q.   The entry history shows that on Monday, February 19th, 2024, there are two edits identified as edited by Michael DiNicola, one at 9:53 a.m. changing the out time to 5:43 p.m. and another at 9:54 a.m. changing it to 4:50 p.m. Is that correct?

A.   Yes.

MS. GRASSOTTI:  Object to the form.

BY MR. BLACKBURN:

Q.   And again, you are the Michael DiNicola that is identified on this document, right?

A.   Yes.

Q.   And that's you that's identified, then is it safe to say that you are the one that made the edits to these records, correct?

A.   Correct.

Q.   And I know this may sound repetitive, but I just have to get it for the record.  What

was the reason for reducing her clock-out time from 5:53 p.m. to 4:50 p.m.?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Reducing it from 5:43 to 4:50?

BY MR. BLACKBURN:

Q.   Yes, from 5:53 p.m. to 4:50 p.m.?

A.   I'm assuming that I just typed in the wrong time the first time.

Q.   And to the best of your recollection, did she ask you to make that change?

A.   No.

Q.   Was there any written record from her indicating her original clock-out time was inaccurate?

A.   No.

Q.   Did you understand that this edit removed more than one hour from her recorded time for that day?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  I would have been aware of that.

BY MR. BLACKBURN:

Q.   Okay.  And just reflecting on Exhibit F -- I'm taking Exhibit F and Exhibit A

together -- is it accurate to say that you made

edits reducing Ms. Muhammad's recorded time on

two separate occasions within the same month?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Yeah.  Yes.

BY MR. BLACKBURN:

Q.   Okay.

MS. GRASSOTTI:  Can --

MR. BLACKBURN:  Sorry, what -- do you
want a break?

MS. GRASSOTTI:  Could -- yes, could we
take a break?

MR. BLACKBURN:  Okay, yeah, yeah,
sure.  We can stop here for five minutes
or -- how long do you need, ten minutes?

MS. GRASSOTTI:  Yeah, yeah, would that
be okay?

MR. BLACKBURN:  Yeah, yeah, 10
minutes.  No problem.  We can stop here for
10 minuets.

(Recess was taken from 11:46 a.m. to 12:01 p.m.)

(Thereupon, the court reporter was asked to read
back the aforementioned question.)

BY MR. BLACKBURN:

Q.   I just wanted to ask a follow-up

question regarding the requirements of the couriers, to the best of recollection.

So other than clocking-in and clocking-out, is there anything else that couriers were required to submit, things such as reports or any documents while not clocked-in?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  No.

BY MR. BLACKBURN:

Q.   Okay.  All right.  So I think I'm done with this exhibit and I'm going to display the next exhibit.

(Whereupon,  Exhibit G, April 17, 2024 Timesheet was marked for identification.)

MR. BLACKBURN:  I'm now displaying Exhibit G on the screen for all parties.

BY MR. BLACKBURN:

Q.   Mr. DiNicola, can you see that document clearly?

A.   Yes.

Q.   I'm going to just represent again, that this document is part of the productions that was made in this case by plaintiff, Muhammad, and it reflects a screenshot from her time and attendance WhenIWork entry history from

April 2024.

So, do you recognize this document?

A.    It looks like the clock-in and clock-out as well.

Q.    The entry history shows that on Wednesday, April 17th, 2024, Ms. Muhammad clocked-in at 12:15 p.m. and clocked out from mobile at 6:49 p.m.  She was scheduled at 4:30 p.m.

Did I read that correctly?

A.    Yes.

Q.    The entry history also shows that on Thursday, April 18th, 2024, at 1:41 p.m. there's an edit identified as edited by Alto admin EST changing the out time to 5:48 p.m.

Did I read that correctly?

A.    Yes.

Q.    Do you know who or what Alto admin EST refers to?

A.    I believe it was the main account for that.  Whoever had that, the rights to that, had the login for that admin, I believe.

Q.    Okay.  And who would be the person to have the rights to the main account?

A.    Amy.

Q.    Okay.  And would Josh have it as well?

A.    I'm sure he would have, yes.

Q.    So earlier we discussed that you would have had the monthly meetings and weekly meetings with Josh and Amy to go over the punch-in and punch-out records.  Was it typical for Amy and/or Josh to make edits to the time records for the couriers?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Typical, no, but they did make changes periodically.

BY MR. BLACKBURN:

Q.    Would they notify you of those changes before making them?

A.    Not that I can recall.

Q.    To the best of your knowledge, would they have contacted Ms. Muhammad or any other courier to notify them of the edits they were making to their time records?

A.    Not that I know of.

Q.    Okay.  And to the best of your knowledge, was it typical for them to be in direct communication with couriers at all through the time that you were employed there?

A.    Amy was, yes.

Q.    Was Amy a part of the Slack group chat?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  She was --

BY MR. BLACKBURN:

Q.    Go ahead.

A.    She was in that channel as well, in the New York pharmacy channel.

Q.    To the best of your recollection, did any courier directly communicate with Amy in that chat?

A.    In that chat, not that I know of.

Q.    To the best of your recollection, did Amy ever give any directives to either yourself or to the dispatchers within that Slack chat?

A.    Yes, but not as the first time hearing it.  We would hear it first in a meeting, and that through Slack would be just an update, reminder keep an eye on this or that, whatever the situation was.  But anytime a new policy was implemented or told to us, it was always done first through Zoom meeting.

Q.    So, did you have any, to the best of your recollection, did you have any involvement

in or knowledge of this April 18th edit shown in Exhibit G?

A.   No, no, I don't remember this at all.

Q.   As described here on the screen, this edit removed approximately one hour and one minute from Ms. Muhammad's recorded time, correct?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Correct.

BY MR. BLACKBURN:

Q.   Correct?

A.   Correct.

Q.   Okay.

(Whereupon,  Exhibit H, May 21, 2024 Timesheet was marked for identification.)

MR. BLACKBURN:  I am going to display another exhibit.  I'm now displaying Exhibit H on the screen for all parties.

BY MR. BLACKBURN:

Q.   Mr. DiNicola, can you see this document clearly?

A.   Yes.

Q.   Do you recognize this document?

A.   Yes.

Q.   I'm going to make the representation

that this document is a WhenIWork entry history screenshot for Ms. Muhammad, and that this document was also provided to defendants as part of Ms. Muhammad's document disclosures earlier on in this case.

The entry history shows that on Tuesday, May 21st -- I will also -- sorry -- I will also make the representation that this document is reflective of a May 2024 screenshot of Ms. Muhammad's time records, okay.

So this entry shows that on Tuesday, May 21st, 2024, Ms. Muhammad clocked-in at 5:45 p.m. and clocked-out from her mobile at 10:00 p.m. consistent with her scheduled end time, correct?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Correct.

BY MR. BLACKBURN:

Q.   The entry history shows that on Wednesday, May 22nd, 2024, at 12:22 p.m. there is an edit identified as edited by Alto admin EST changing the out time to 8:17 p.m.

Did I read that correctly?

A.   Yes.

Q.   Did you have any involvement in or

knowledge of this edit?

A.    No.

Q.    This edit removed approximately one hour and 43 minutes from Ms. Muhammad's recorded time, correct?

A.    Correct.

Q.    So just another question:  Why would admin EST reduce Ms. Muhammad's time, her clock-out time if she clocked-out at the scheduled time of 10:00 p.m.?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  I don't know.  I would only have assumptions.  I don't know why they would do that.

BY MR. BLACKBURN:

Q.    All right.  I'm going to remove this and upload another.

MR. BLACKBURN:  I'm now displaying Exhibit I on the screen for all parties.

(Whereupon,  Exhibit I, April 23, 2024 Timesheet was marked for identification.)

BY MR. BLACKBURN:

Q.    Mr. DiNicola, can you see this document clearly?

A.    Yes.

Q.   Do you recognize this document?

A.   Yes.

Q.   So, I'm going to make the representation that this document is a screenshot of Ms. Muhammad's WhenIWork timesheet for the week of April 22nd through April 29th, 2024, and that these documents is part of the documents disclosures turned over to defendants earlier on this case on behalf of Ms. Muhammad.

The timesheet shows that on Tuesday, April 23rd, Ms. Muhammad worked 10.3 hours from 10:15 p.m. to 6:06 p.m., then 6:47 p.m. to 11:14 p.m.

Did I read that correctly?

A.   Yes.

Q.   Timesheet also shows that on Wednesday, April 24th, Ms. Muhammad worked 10.52 hours from 12:15 p.m. to 10:46 p.m.

Did I read that correctly?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Yes.

BY MR. BLACKBURN:

Q.   The timesheet reflects a total of --
the total paid hours for that period of 20.82 hours.

Did I read that -- hold on, let me move up -- right there, at the bottom.

Did I read that correctly?

A.   Yes.

Q.   So I'm going to move on to the next set of questions.

So I am looking at Exhibits E, F, G, which were all screenshots of Ms. Muhammad's WhenIWork schedules from 2024.  In each instance, it represented that Ms. Muhammad's record recorded clock-out time was reduced.  Is that a correct representation of what those exhibits showed?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Yes, yes.

BY MR. BLACKBURN:

Q.   Are you aware of any instance where a supervisor, either dispatch, Amy, Josh, yourself, increase Ms. Muhammad's recorded time to reflect hours that were missed?

A.   Not off the top of my head.

Q.   Are you aware if that ever occurred for any other courier, not named Ms. Muhammad?

A.   There have been.  There were times where I increased someone's time.

Q.   Okay.  And what was the circumstances behind that?

A.   Most of the times they punched out by accident.

Q.   Okay.

A.   One time somebody punched out on the last -- the second to last drop before going to make that last drop, so I would increase that time.

Q.   Just to reflect the accuracy of the next delivery?

A.   Correct.

MS. GRASSOTTI:  Object to the form.

BY MR. BLACKBURN:

Q.   I am going to turn to what was marked as Exhibit B earlier.

So you see here, Exhibit B, courier timekeeping policy?

A.   Yes.

Q.   It says here -- hold on, let me get to the proper section.  Under timekeeping, the second sentence begins with -- it will be -- sorry, halfway through that paragraph where it says, it will not be the responsibility of supervisors to determine hours worked for any

courier.

Did I read that correctly?

A.   Yes.

Q.   Yet in Exhibits E and F, a supervisor determined that Ms. Muhammad's hours should have been reduced, correct?

MS. GRASSOTTI:  Object to the form.

(Off-the-record discussion was held.)

BY MR. BLACKBURN:

Q.   Okay.  So again, just focusing on this policy, where in this written policy does it authorize the supervisor to unilaterally reduce a courier's recorded time without the courier's consent?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  I don't know if it does or not.

BY MR. BLACKBURN:

Q.   Were you ever disciplined, corrected or counseled for reducing couriers' recorded hours?

A.   No.

Q.   The opposite is what occurred, correct?

MS. GRASSOTTI:  Object to the form.

BY MR. BLACKBURN:

Q.    Were you encouraged to reduce couriers' recorded hours?

A.    I was encouraged to have the time to punch-out match their last delivery.

Q.    That was the only focus, the focus was the time the last delivery was made, correct?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Correct.

BY MR. BLACKBURN:

Q.    That was an instruction provided to you by Amy and Josh, correct?

A.    Correct.

Q.    And you testified earlier that you did not feel that you had the authority to go against that instruction from Amy and Josh, correct?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Correct.

BY MR. BLACKBURN:

Q.    Okay.  And can I ask you this:  If it was up to you, would you have personally reduced all these couriers' hours?

A.    Honestly, I would have matched the last delivery.

Q.   Okay.  And why would that be?

A.   Because their shift was done.  Unless they had -- if they had a package for the company in their car, I agree that they should have been paid.  Once they made that last delivery, their shift was over, and personally I believe that's when their shift ends.

Q.   But do you think that they should have been paid for having to take packages home?

A.   At the time that -- I believe, there should have been some type of compensation.

Q.   Okay.  So just on your role as a supervisor, were you evaluated on labor hours, labor cost, overtime, efficiency or productivity?

A.   All of the above for the drivers, yeah.

Q.   Really?

A.   Uh-huh.

Q.   And what were the metrics the -- what were the standards that was given to you by either Amy, Josh or someone else that was above you?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  The only one that I

remember that stands out at me was the on-time rate, that Amy wanted it at 98 percent or higher and then there was increases to the average amount of drops on a route.

We started at like 16, and then towards the end they wanted it up to 20, 22, 24, and at the same time reducing the amount of overtime being paid.

BY MR. BLACKBURN:

Q. So, they wanted more productivity and less overtime being allocated to these drivers, correct?

MS. GRASSOTTI: Object to the form.

THE WITNESS: Correct.

BY MR. BLACKBURN:

Q. Okay. And if you didn't meet those metrics, what would be the outcome for your review?

MS. GRASSOTTI: Object to the form.

THE WITNESS: I'm assuming I would have gotten a bad review. I probably would have even written up.

BY MR. BLACKBURN:

Q. Really?

A.   Yes.

Q.   Were you ever threatened to be written up?

A.   Not in that exact -- those exact words, but I was told that accountability will be -- I'll be held accountable for not hitting metrics or not being able to reduce the cost while increasing production.

Q.   So, do you feel that you were somewhat pressured to make sure that you hit those metrics that you described?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  In a way, yeah.  Yes. Even though I knew some of them were maybe a little bit out of reach, but there was still a daily pressure to try to make it happen.

BY MR. BLACKBURN:

Q.   You said daily pressure.  That was coming from whom?

A.   It was Amy for the most part.  Josh seemed to have let his foot off the gas a little bit when he took over, but Amy was the one that was driving the -- following the metrics and hitting our goals.

Q.   I remember earlier you mentioned there are other areas supervisor or area managers like yourself who worked in other regions within the United States.

To the best of your recollection, did any of those area supervisor or managers get disciplined or terminated or written up for failing to meet these metrics?

A.   Two area managers were let go.  Why they were let go, I do not know.  But I do know that the area managers that were still there towards the end of my time, we were all given the same directive and letting us know that we will be the ones being held accountable for what happens on the roads.

Q.   And, you know, between yourself and your other area managers, did any of them ever communicate any kind of frustration to you regarding these directives and metrics that was handed down by Amy and Josh?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  There were times where we would have a -- one area would have a tough week where there would be too many packages, not enough drivers, and they

would expect us to still hit those numbers.

But that didn't happen all the time, but there were conversations.

BY MR. BLACKBURN:

Q.   So, in a situation like that, if a driver -- if you guys don't have enough drivers, but there is a lot of, you know, deliveries to be executed, clearly there would be a need for overtime, correct?

A.   Correct, in those situation, yes.  But the first thing that we would do is we would try to reach out to other drivers who weren't on shift, see if they would pick up a shift. Sometimes they will even have us offer them a bonus if they picked up a shift to come in.  If that didn't work, then, yeah.  Unfortunately, drivers would have a much bigger route.

Q.   And would you still have the same type of pressure of keeping the overtime low in those kinds of scenarios?

A.   Yeah, yes.

Q.   Okay.  And how would you accomplish both, you have a huge influx of deliveries to be made, not enough bodies to make the deliveries, but also have to make sure that overtime is

reduced, so what would be your way of

accomplishing all three?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Again, it was just

trying to get other drivers in and giving

them a bonus.  On the days that we

couldn't, unfortunately, the overtime was

just -- it had to happen on days.

BY MR. BLACKBURN:

Q.   Okay.

A.   I would express that to Amy.  I am

like, there is nothing I can do if I don't have

the physical manpower to get these packages

delivered.

Q.   Was there ever a time that either

yourself or Amy or a dispatcher reduced a

courier's overtime in that scenario that you

just described?

A.   No.

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  I don't remember that.

Like I said, I only recall any time changes

being to match that last delivery.

BY MR. BLACKBURN:

Q.   You said you don't recall that, but

that doesn't mean it didn't happen, correct?

A.    Yeah.

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  I'm not going to speak for somebody else.

BY MR. BLACKBURN:

Q.    So, it's possible that somebody else could have done it, but just not you?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Correct.  Apparently, the admin had the ability to make those changes.

BY MR. BLACKBURN:

Q.    Okay.  You see, you learn something new every day, right?

A.    Yeah.

Q.    We may have touched on this already, but I just want to make sure I get the question on the record and your answer.

Were your supervisors monitoring whether your location or team stayed within payroll or labor targets?

A.    Can you repeat that, I'm sorry.

Q.    The question was:  Were your supervisor monitoring whether your location or

team stayed within payroll or labor targets?

A.   Yeah, I would say, yes.

Q.   Did your supervisors ever provide you with reports comparing scheduled hours to actual recorded hours?

A.   There was an Excel sheet that had that, yes.

Q.   Oh, really?

A.   Yeah.

Q.   Who had this Excel sheet?

A.   If I remember correctly, Amy had it that had hours on it and expectations when it comes to routes and time and things of that nature.

MR. BLACKBURN:  I will just pull on the record that we will be making a supplemental discovery demand request for copies of all of those Excel spreadsheets from either Amy, Josh or any other executive at Alto that reflects what Mr. DiNicola just disclosed.

BY MR. BLACKBURN:

Q.   Okay.  Did that Excel spreadsheet record any adjustments that were made to the couriers' hours?

A.    It did keep track of how many hours we use as a total, not individual couriers, but just as a whole for the day or for the week.

Q.    Did it keep track of the total amount of adjustments that were made?

A.    I don't think so.  It was a running -- it was a week-to-week thing, so it would always show the numbers from the week prior or from the month prior.

Q.    Okay.

A.    And those numbers kept changing as time went on.

Q.    But it wouldn't show you whether the numbers were reduced and by how much and by whom?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  No, it would -- sorry.
It would just show the total numbers and what they were compared to the previous months.

BY MR. BLACKBURN:

Q.    Did the edits to the couriers' recorded time affect whether your team appeared to meet labor targets?

A.    No.

Q.   I think I may have asked you about it earlier, but I don't think we really went in too deep on this, but were you eligible for any bonuses, incentive compensations or performance-based rewards in 2023 or 2024?

A.   No, I didn't get a bonus at any time -- my time there.  I don't think I did.

Q.   Was there ever like a competition between area managers, and if you came in with the best numbers, then you would get, you know, a bonus or anything?

A.   No.

MS. GRASSOTTI:  Object to the form.

BY MR. BLACKBURN:

Q.   Go ahead.

A.   We didn't have an incentive program or anything like that.

Q.   Did you have access to any kind of profit and loss statements or information for the Manhattan operation for the courier workforce?

A.   No, I only had a copy of the roster of the drivers of the couriers.  Anything else, I didn't have access to.

Q.   Did you ever make any decisions

regarding time edits based on budget profitability, margins or labor utilization?

A.   No, the only thing that I used was that last delivery drop.

Q.   Okay.

A.   That was my only metric.  The only thing I used.

Q.   So, I know you said that you didn't get any bonus incentive or anything like that, but did you ever like receive praise or given favorable treatment for keeping hours low?

A.   No.

Q.   I guess the opposite, were you ever criticized when labor hours all the time were too high?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Criticized, no, but pressured to get those numbers down, yes.

BY MR. BLACKBURN:

Q.   Okay.  So as a supervisor, did you treat the couriers as part of Alto's regular workforce?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Yes and no.

BY MR. BLACKBURN:

Q.   Okay.   Can you explain?

A.   I knew that they were independent contractors and had the freedom to do what they wanted to, but I also worked with them on a daily basis, so I treated them as if they were one of us.  When they said no -- if I asked them for something and they said no, that was the end of the conversation.  I would move on to something else.

Q.   When you said you would ask for something, what would that be specifically?

A.   Most of the times I would ask if they would cover a shift later on in the day, that day, the next day, whatever the case may be.

Q.   So, it would be stuff that they were not already scheduled to do, but it would be something extra, like an extra shift or extra, you know?

A.   Correct, if somebody --

MS. GRASSOTTI:  Object to the form.

BY MR. BLACKBURN:

Q.   Sorry, go ahead.

A.   So yeah, if I might have -- there were times where I would call out for that second

delivery for that second window and I would reach out and ask somebody, hey, can you come in and do this route, do this, take this shift, whatever the case may be.  That's usually the only thing that I was asking of the drivers or the couriers, was, can you pick up an extra shift, whatever that time was.

Q.   Okay.  In your day-to-day dealings, did you treat couriers any differently from Alto's other employees in terms of scheduling, supervision, route assignment or discipline?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  No.

BY MR. BLACKBURN:

Q.   Okay.  And I don't know if you recall earlier, I showed you an Exhibit A -- give me a second to pull it up.

And it's Afiyfah Muhammad's employee ID.

As shown in Exhibit A, couriers were assigned employment ID in Alto's system, correct?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Correct.

BY MR. BLACKBURN:

Q.    Sorry, go ahead.

A.    Correct.

Q.    Were couriers subjected to Alto's written employment-related policies including the timekeeping rules that was displayed in Exhibit B?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Yes.

BY MR. BLACKBURN:

Q.    Did couriers have the ability to negotiate their rates of pay or routes or similar to the way an independent business would?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  No, their only freedom was to pick what shifts they wanted and what area of New York they wanted to drive in.

BY MR. BLACKBURN:

Q.    So when you say to pick what areas of New York that they wanted to drive in -- suppose they made a selection, was that set in stone or did Alto have a say in whether or not they would be granted that request?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  It wasn't set in stone, but before we had to move -- let's say somebody was in that Brooklyn shift and we needed somebody in Queens, we would reach out to drivers in Brooklyn first to see if anybody was willing to volunteer to go to Queens, and then there would be times that we might add a bonus to somebody to go out of area and then if that wasn't -- if nobody still took that route, we would just give it somebody.

BY MR. BLACKBURN:

Q.   Okay.  Did you consider couriers to be operating their own independent delivery businesses or were they working as part of Alto's delivery operation?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  I saw them as employees, drivers of the company.

BY MR. BLACKBURN:

Q.   So, they were working as part of Alto's delivery operation, correct?

A.   Yeah.

(Recess was taken from 12:36 p.m. to 12:40 p.m.)

(Whereupon,  Exhibit C, Termination Email was marked for identification.)

BY MR. BLACKBURN:

Q.   Do you see what's marked as Exhibit C?

A.   Yes.

Q.   Okay, let's start --- let me rephrase this.

MR. BLACKBURN:  I'm now displaying Exhibit C on the screen for all parties.

BY MR. BLACKBURN:

Q.   Mr. DiNicola, can you see this document clearly?

A.   Yes.

Q.   This is the July 2nd, 2024 email from Alto's deliver team informing couriers that Alto Pharmacy has made the difficult decision to terminate all courier contracts at your location including yours.

Did I read that correctly?

A.   Yes.

Q.   Okay.  Were you involved in the decision to terminate all courier contracts at the 100 Park Avenue location?

A.   No, I was gone before that.

Q.   Okay.  Prior to your leaving, did you

receive any communications from Alto's management about the reason for the mass termination?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  No, I wasn't told why there was going to be the mass termination, but I was told why or how we were going to be scaling back when they partnered with Uber.

BY MR. BLACKBURN:

Q.   Partnered you said with Uber?

A.   Yeah, I think that's what they called if.

Q.   Okay.  So who did you have that conversation with?

A.   I believe it was Amy and Josh.

Q.   And around when did that conversation happen?

A.   A month or two before I left, when we started -- when they started to really tighten the noose around the overtime.

Q.   Okay.

A.   It might have been a couple -- maybe more than two months before the end of my time there, but, yeah, the last few months it was

geared towards lowering overtime, increasing the

packages because what was coming with their

partnership.

Q.   Okay.   And what was the reason

provided to you by Josh and Amy for this mass

layoff?

MS. GRASSOTTI:   Object to the form.

THE WITNESS:   They didn't give me a

reason why they were the company was making

that decision.

BY MR. BLACKBURN:

Q.   Were you the only person that was a

part of that conversation or were the other

areas managers included as well?

MS. GRASSOTTI:   Object to the form.

THE WITNESS:   The other area managers

were included as well.

BY MR. BLACKBURN:

Q.   Okay.

A.   Because we were being told that --

some of -- originally some of the -- all the

packages weren't going with Uber.   It was only

going to be a handful each day, so the initial,

conversation was how we were going to plan for

that.   And then it -- after I left, it turned

into the mass firing.

Q.   Okay.  And what was the plan, the initial plan during those conversations regarding Uber?

A.   If I remember correctly, it was the high valued items that had to be delivered, were set aside for Uber, and the other packages were put on routes for the drivers.

Q.   And how did you determine if a package was high value?

A.   I believe that was the pharmacy that made that decision or the pharmacist that made the decision, depending on what that package was.

Q.   So if it was like a CPAP machine or like narcotics, then it would be considered high value?

A.   For me, yeah.

MS. GRASSOTTI:  Object to the form.

BY MR. BLACKBURN:

Q.   I am sorry?

A.   Yes.

Q.   Were the dispatchers informed of this as well?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Yes, we were all informed about it.

BY MR. BLACKBURN:

Q.   But the only people that weren't informed were the couriers, correct?

MS. GRASSOTTI:  Object to the form.

BY MR. BLACKBURN:

Q.   Sorry, go ahead.

A.   Correct.  They were informed about the Uber partnership the first day Uber started making deliveries for us.

Q.   Okay.  So, I'm just going to read the email.

Hello courier, you should have received a Slack message letting you know that Alto Pharmacy has made a difficult decision to terminate all courier contracts at your location including yours.

Please know that this decision was not made lightly.  We have had to make some tough decisions over the past year to ensure we're enhancing our delivery offerings and increasing efficiency for our patients.  Your contract with Alto Pharmacy will end in two weeks on July 16th, 2024.  Read carefully.  You

can continue to pick up delivery routes through 7/16.

I understand that this news may come as a shock and I want to express my deepest gratitude for your hard work and dedication during your time with us.

If you have any questions, please use the feedback workflow in Slack to call or email driver@alto.com.  Dave.

Did I read that correctly?

A.    Yes.

Q.    Okay.  So who is Dave?

A.    I think he was the head of all shipping operations or logistics in the company.

Q.    Am I correct to say that the email makes no reference to any independent contract or agreement or any provision of such an agreement as the basis for the termination?

A.    Correct.

Q.    Okay.  Did anyone at Alto explain to you why New York couriers received only 14 days notice of termination?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  No.

BY THE WITNESS:

Q.   Sorry?

A.   No.

Q.   And they had known about this, according to you, months before you left, correct?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Yeah, it seemed like it was at least two months before this that they knew what was coming.

BY MR. BLACKBURN:

Q.   So when did you first learn that some Alto couriers, including Ms. Muhammad, had filed a federal lawsuit alleging misclassification and unpaid wages?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  When did I know she filed -- when I was subpoenaed with this -- for the deposition.

BY MR. BLACKBURN:

Q.   Okay.

A.   But I was told about it back when I was still with the company.

Q.   So who told you about it?

A.   One of the other drivers told me that

Afiyfah had approached her about filing a lawsuit.

Q.   And do you recall who that driver was?

A.   I believe her name was Liza Gonzalez.

Q.   Did you share that information with Amy for Josh?

A.   I shared it with Amy.

Q.   What was Amy's reaction to that?

A.   There was really no reaction.  She didn't -- I don't know if she didn't take it serious or she just didn't believe that it was a thing, but it was -- to her, it was no news.

Q.   Well, is your testimony that you didn't know when the lawsuit was actually filed, correct?

A.   Correct, I don't know that.

Q.   All right.  I'm almost done.  Just to retouch a little bit on the communications with Amy and Josh.

When it came to their review of the hours of the couriers, did you ever receive any written instructions about editing time records from Amy or Josh?

A.   I can't definitively say yes, but I'm assuming that Amy or Josh would have sent me a

message reminding me to keep on top of that, keep track of their time.

Q.   And what platform would they use to provide you with that instruction?

A.   Slack.

Q.   All right.

MR. BLACKBURN:  I'll just state for the record that we will be following up with a supplemental request to have all Slack communications between Amy, Josh, and Michael DiNicola regarding any instructions provided in reducing or monitoring the time and attendance records of the drivers. Okay, so -- the courier drivers.

BY MR. BLACKBURN:

Q.   Did anyone -- I should have asked you this in the beginning, but did anyone prepare you for today's deposition?

A.   No.

Q.   Did you review any documents in preparation for today's deposition?

A.   No.

Q.   Did anyone instruct you on what to say or what not to say about the potential topics of today's deposition?

A.   No.

Q.   Okay.  I think I'm done.  Just give me one minute to let me just go over my notes and then, I guess, I'll turn it over to Lauren if she has any questions.  So give me -- let's come back at 1:00.  Would that be fine?  Because right now it's like 12:51?

A.   Uh-huh.

Q.   All right, yeah, cool, no problem.

(Recess was taken from 12:51 p.m. to 12:58 p.m.)

MR. BLACKBURN:  I have no more questions.  I am done.

CROSS-EXAMINATION

BY MS. GRASSOTTI:

Q.   Good afternoon.  My name is Lauren Grassotti.  I am an attorney with the law firm JacksonLewis and we are counsel for the defendant Alto Pharmacy in this lawsuit and I am going to be asking you a few questions today.

A.   Okay.

Q.   I -- sorry, are you currently employed by Alto?

A.   No.

Q.   Have you spoken with anyone at Alto regarding your deposition today?

A.  No.

Q.  Have you spoken with anyone at Alto about this case?

A.  No.

Q.  Are you represented by Alto's attorneys in connection with your deposition today?

A.  No.

Q.  Have you spoken with any attorneys for Alto regarding this case where you are appearing here today?

A.  No.

Q.  Did you speak with Mr. Blackburn before today's deposition?

A.  No, only about setting up a deposition.

Q.  So you spoke with him?

A.  Via text message, yes.

Q.  Okay.  And do you recall when that was, when was the first text message?

A.  Three weeks ago asking me if I could set up a deposition.  Maybe a little bit more than three weeks ago.

Q.  Was it before or after you had received the subpoena?

A.    Before.  I told them I needed a subpoena in order to testify.

Q.    So, he -- do you still have those text messages?

A.    I think I do, yes.  I don't think I deleted them.

Q.    Okay.  Well, we will ask that you continue to preserve those?

A.    Okay.

Q.    So the first text message was from Mr. Blackburn and what did he ask you?

A.    If and when I could sit for a deposition.

Q.    You told him?

A.    I told him I needed -- to give me a subpoena, which he did, and then we scheduled the -- and then I got a message earlier this week just confirming the deposition for today.

Q.    And other than those text messages you just described, did you have any other communications with Mr. Blackburn before today's deposition?

A.    No.

Q.    Did you have communications with any other attorneys for plaintiffs before today's

deposition?

A.    No.

Q.    Have you spoken with Afiyfah Muhammad regarding this case?

A.    No.

Q.    Have you spoken with any of the couriers or former Alto...

A.    No.

Q.    Sorry, withdrawn.  I got jammed up in the middle there.

Have you spoken with any former couriers regarding this case before today?

A.    No.

Q.    Were you the area supervisor during the time that Ms. Muhammad provided courier services to Alto?

A.    Yes.

Q.    Were you the area supervisor during the time when Dominique Skinner provided courier services to Alto?

A.    Yes.

Q.    Were you the area supervisor during the time that Darren Wilson provided couriers services to Alto?

A.    Yes.

Q.   And have you spoken with Mr. Skinner regarding this case?

A.   No, I have not.

Q.   Have you spoken with Mr. Wilson regarding had case?

A.   No, I have not.

Q.   During your employment with Alto, did anyone ever instruct or tell you to edit or change courier clock-out times for any reason other than to match up to the completion of the last activity time as reflected in Onfleet?

A.   No.

Q.   You testified earlier regarding -- or Mr. Blackburn asked you some questions earlier regarding courier training.  Did your responsibilities as area supervisor include anything related to courier training?

A.   No.

Q.   Earlier I believe you had testified -- and if you don't recall, we can ask the court reporter to find it and read back -- that while drivers were clocked-in, they were expected to be providing services exclusively to Alto and not for any other delivery service; is that accurate?

A.    Yes.

Q.    So, does that mean if they were clocked-out, then they were free to provide delivery services, any type of services to anybody else other than Alto?

A.    Yes, yes.

Q.    Were couriers required to return to the pharmacy after their deliveries, if they were successful and had nothing to return?

A.    No, they were allowed to clock-out and go home.

Q.    Do you have an understanding of what couriers did -- sorry, let me add this.

So after completion of the last delivery, you testified that at that time when the last delivery was completed, that time will be reflected in on Onfleet?

A.    Recall correct.

Q.    And that the expectation and instruction and understanding was that that time was also supposed to correspond to the time the person would clock-out from WhenIWork, yes?

A.    Yes.

Q.    Do you have an understanding of what couriers did during the time between completing

their last delivery and clocking-out in instances where those times didn't match?

A.   Sometimes it will be a five, ten, fifteen minutes if they had to walk back to their car, sometimes drivers forgot to clock-out and sometimes drivers would try to just milk the clock for some more time.

Q.   What do you mean by that?

A.   Like I would -- drivers would complete that task and they wouldn't clock-out for a half hour, 45 minutes, so they can get paid for that half hour or 45 minutes.

So there were times where they -- if it was a -- and especially in New York City, there might be a five-minute wait from the last delivery until they clock-out because they had to walk back to the car, but the other times it's -- the company considered it stealing time if they are clocking out 10, 15, 20 minutes, 30 minutes after that last delivery.

Q.   The last delivery time as reflected in Onfleet, is that the time that the services were complete?

A.   Yes.

Q.   And after that completion of services,

were the couriers free to go about their daily lives?

A. Yes.

Q. I believe you testified that Amy was only your manager for a short time?

A. Yeah, she was -- five or six months. I don't remember exactly how long, but she came on as my supervisor and then it was -- Josh took over for her and she went into some other position.

Q. So at the time that you were hired -- and I'll represent to you that it was in the year 2022 -- Amy was, Amy -- you can't remember her last name, right?

A. Amy wasn't the one who hired me.

Q. Right. But was she your direct supervisor at the time when you were hired?

A. No, my direct supervisor at hiring was Melania and then a couple -- like a month or two later is when Amy came on as my supervisor.

Q. Okay. So you had three supervisors?

A. Yeah.

Q. During the time you were at Alto. So first it was Melania?

A. Yes.

Q.    Then it was Amy?

A.    Yes.

Q.    And finally it was Josh?

A.    Yes.

Q.    And of the three managers, who was your manager for the longest period of time?

A.    It was Amy.

Q.    Amy?

A.    Yes.

Q.    Because I thought you testified she was only your manager for a few months?

A.    It was about -- this was two years ago, so it was about six or seven months that she was my supervisor.

Q.    But you don't remember approximate time of --

A.    No.

Q.    -- when that was?

A.    No.

Q.    Okay.  Throughout today's deposition at various times you used the word overtime, where you referred to overtime.  What did you mean by that?

A.    Anything passed that three-hour shift.  If it was a three-hour shift, to me I consider

anything over three hours would be overtime.

Q.   So the shift -- the shift -- the
scheduled shift duration?

A.   Yes, anything over that, to me would
be considered overtime.

MS. GRASSOTTI:  Tyrone, would you mind
putting back up Exhibit A?

MR. BLACKBURN:  One second.

MS. GRASSOTTI:  Thanks.

BY MS. GRASSOTTI:

Q.   While he's doing that, Mr. DiNicola,
just to follow-up on my previous question in
terms of the expected duration time for the
shifts, be it three hours or whatever it was,
were the couriers aware in each shift what that
expected duration was?

MR. BLACKBURN:  Objection.

THE WITNESS:  Yes.

MR. BLACKBURN:  You can answer.

THE WITNESS:  Yes.

BY MS. GRASSOTTI:

Q.   How did they know that?

A.   In the shift, when they selected the
shift, it gave them, told them the time of the
shift.

Q.   So, couriers selected or chose which shifts they wanted to accept?

MR. BLACKBURN:  Objection.

THE WITNESS:  Correct.

MS. GRASSOTTI:  Thanks, Tyrone.

BY MS. GRASSOTTI:

Q.   Okay.  You have on the screen what was previously marked as Exhibit A.  I think originally maybe you testified that you weren't familiar with the document, but then maybe later you testified you believe it came from Alto's system.  What system did that come from?

A.   Me, I don't know.  I remember seeing this.  I don't remember the employee ID being there, but I remember seeing this while working at Alto.

Q.   Where do you remember seeing it?

A.   One of the systems.  It could have been WhenIWork.  I don't know exactly which system it was.

MS. GRASSOTTI:  Can you put up Exhibit E, please, Tyrone?

MR. BLACKBURN:  Okay.

BY MS. GRASSOTTI:

Q.   This is the document that was

previously marked as Exhibit E.  Can you tell

from this document which courier time this

relates to?

A.   No.

MS. GRASSOTTI:  Can you please put up

Exhibit G?

MR. BLACKBURN:  Okay.

BY MS. GRASSOTTI:

Q.   This is the document that counsel for

plaintiff's previously marked as Exhibit G.

Same question:  Can you tell from this

screenshot which courier's time this reflect?

A.   No.

Q.   With regard to this document, I

believe you testified that the Alto admin EST,

that you believe it would have been whoever had

the rights to the main account; is that --

A.   That is -- yeah, that is from my

understanding.

Q.   What is that understanding based on?

A.   What I was told from when I worked

there.  That I was told that the admin is the

one who has control of the account.

Q.   What account?

A.   This account?

Q.   What is this --

A.   Whoever is running the Alto admin EST, that's the account, that -- what I was told that's the account that sets up all the other accounts and that admin EST could jump into any account and do whatever it needs to do, as well as has the same permissions to make any change in the system.

Q.   And when we talk about system and account, what specific system are we talking about?

A.   Is this work -- WhenIWork?

Q.   I am asking you.

A.   WhenIWork, Work While, Slack, they all had the -- the admin had the rights and permissions to set up all the accounts.  So, I was under the assumption that anything that had this Alto admin in any system that we used, whether it be Onfleet, Slack, WhenIWork, Work While, Workday, that that was the company who runs that account.

Q.   Company being Alto?

A.   Alto, yes.

Q.   How do you know -- because I believe you testified that Amy and Josh had the admin

rights for WhenIWorked.  So how do you know that?

A.   Because I was told that.

Q.   By whom?

A.   In the very beginning it was by Melania.  I was told by Jae and I was told by Amy.  And during meetings with Amy, she would log on to accounts, she shared her screen showing the admin.

Q.   Do you know whether Amy and then later Josh were they the only people who had access to this?

A.   That, I do not know.

MS. GRASSOTTI:  Can you please put up Exhibit H?

BY MS. GRASSOTTI:

Q.   This is the document that Mr. Blackburn previously marked as Exhibit H.

Prior to Mr. Blackburn showing you this document on his screen and marking it as Exhibit H, had you seen this document before, this specific screenshot?

A.   No.  Not that I could recall.  I definitely didn't see this.

Q.   So, today was the first time you saw

this document?

A.   Yes.

MS. GRASSOTTI:   Can you please put up Exhibit I?

BY MS. GRASSOTTI:

Q.   This is the document previously marked by counsel for plaintiff's as Exhibit I.  Prior to that, had you ever seen this document before?

A.   No.

Q.   What is this document?

A.   It's a timesheet from April 22nd to the 29th.

Q.   Can you tell which person this timesheet relates to?

A.   No, I cannot.

Q.   Do you know where this is from?

A.   I think this is WhenIWork.

Q.   How do you know that?

A.   It just looks like it from what I remember from my time there.  This looks like the system that I was using on a daily basis.

Q.   If I represented to you that Amy's last name was Stout, would that refresh your recollection as to Amy's last name?

A.   Yeah, that -- yeah, I was thinking

Scholtz or Stouts or something like that, yes.

Q.   If I told you that Melanie's last name was Portillo, would that refresh your recollection as --

A.   Yeah.

Q.   -- to Melanie's last name?

A.   Yeah.

Q.   And if I represented to you that your dates of employment with Alto were July 19, 2022 through March 14th, 2024, would that refresh your recollection as to the dates during which you were employed by Alto?

A.   Yeah, it seems about right.

MR. BLACKBURN:  You said March 14th?

MS. GRASSOTTI:  Yes.

MR. BLACKBURN:  Okay.

BY MS. GRASSOTTI:

Q.   You testified earlier that you -- that Liza Gonzalez told you that Afiyfah Muhammad had approached her to discuss something regarding this lawsuit?

A.   Yes.

Q.   Can you tell me when did Ms. Gonzalez tell you that?

A.   When, no.  I don't know exactly when

she told me.  I just remember what she told me.

Q.   What did she tell you?

A.   She told me that Afiyfah had gone up to her telling her that she was looking to file a class action suit, that she had done it to at her previous employment and won.  And she was going to try it here as well, and she was trying to get drivers to sign on with her.

Q.   Did Ms. Gonzalez say anything else to you about the conversation --

A.   No.

Q.   -- with Mr. Muhammad?

A.   No, that was all she said and -- as well, she said that Afiyfah was trying to get other drivers as well.

Q.   And did Ms. Gonzalez say whether Ms. Muhammad had told her that she was successful?

A.   No.  That, I do not know.

Q.   Did you ever have any other conversations with Ms. Gonzalez about Ms. Muhammad?

A.   No, I didn't.  Once I told Amy and she said to just let it go, that was the last thought I gave of it.

Q.   During the time today that you have

been testifying, have you communicated with

anyone via text or phone or instant message or

any other method?

     A.   No.

          MS. GRASSOTTI:  I have nothing

     further.

          MR. BLACKBURN:  Okay.

               REDIRECT-EXAMINATION

BY MR. BLACKBURN:

     Q.   I am just going to remove this.

Sorry.

               So, I just have maybe two

follow-up questions and then I'll be done.

               Earlier I believe I may have

asked you about the punching out between shifts.

If a driver was in the process of completing

deliveries for -- or couriers I should say was

in the process of completing deliveries on the

first shift, let's say 12:00 to 3:00 shift, and

the last delivery, but then they are also

scheduled -- no, sorry, let me rephrase.

               Was there ever a point in time

that a driver was scheduled to complete two

shifts in one day?

     A.   Yes.

Q.   Whenever that happened, what was the instruction that you provided to the couriers?

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Just like a normal shift.  They would clock-out -- for the first shift when they made their last delivery.  They would clock-out and then they would clock-out again at the start of the second shift.

BY MS. GRASSOTTI:

Q.   You mean clock-in?

A.   Oh, I am sorry.  Yes, clock-in.

Q.   Would they be required to return to the pharmacy in order to clock back in for their second shift?

A.   Yes.

Q.   So, let's say that they ended their first shift and it took them an hour to drive back to the pharmacy to begin their second shift, would they be required to clock-out -- sorry, I'll rephrase.

Would they be compensated for that hour of time between -- for the drive?

MS. GRASSOTTI:  Object to the form.

BY MR. BLACKBURN:

Q.   Go ahead.

A.   No.  Unless they had a package in their bag that they weren't able to deliver.

Q.   Okay.  And then they have -- so they would have to clock-out while, I guess, in the field and then drive back to the pharmacy and clock back in for the start of the second shift, correct?

A.   Correct.

MS. GRASSOTTI:  Object to the form.

THE WITNESS:  Sorry.

BY MR. BLACKBURN:

Q.   So, for Melanie Portillo, did she also provide you with similar instruction that you described earlier that Josh and Amy provided as it pertains to keeping cost low?

A.   No.

Q.   To the best of your recollection at the time that you departed Alto, was Amy still employed with Alto?

A.   Yeah, I believe so, yes.

Q.   What about Josh?

A.   Yes, Josh was still there.

Q.   Okay.  And what was the reason behind

your departure from Alto?

A.   Alto let me go because they said I wasn't going in the pharmacies enough on a weekly basis.

Q.   Right.  And what did that mean -- well, sorry.  Let me rephrase.

What did you understand that to mean?

A.   Well, I was a remote worker covering my four locations.  They wanted me to go on a weekly basis or a daily basis into New York and into Long Island to see the drivers, which I was doing it three days or four days a week, but it wasn't enough for them.

Q.   Were you required to travel to other locations?

A.   No, just Long Island and New York, not Seattle or Denver.

Q.   Would you happen to have or to know what Amy Stout's phone number is?

A.   No.

Q.   What about Josh?

A.   No, I don't have anybody's phone number from then.

MR. BLACKBURN:  All right.  I think

I'm done.  Go ahead.

MS. GRASSOTTI:  I have another question.

MR. BLACKBURN:  Already, go ahead.

RECROSS-EXAMINATION

BY MS. GRASSOTTI:

Q.   Mr. DiNicola, I wanted to clarify something.  So to the extent that a courier had to have a package, an undelivered package at the end of their route and they returned that package to the pharmacy, were the couriers instructed to remain clocked-in during the --

A.   Yes.

Q.   -- time that they were driving back to return the package?

A.   Yes.  All the drivers knew if there was a package in their car they were supposed to be clocked-in, especially if they're heading back to the pharmacy, they were clocked-in until they dropped off that bag.

Q.   Thank you.

A.   You're welcome.

MR. BLACKBURN:  Okay.  I think -- I think I'm done.  All right.  All right.  So, thank you, Michael.

THE WITNESS:  You're welcome.  Thank you, guys.  Have a good day.

MR. BLACKBURN:  All right.  Bye-bye.

THE COURT REPORTER:  This is the court reporter.  Is this going to be written up, are you going to require a transcript?

MR. BLACKBURN:  Yes, yes.  And I'm going to email you -- do you want me to email you the exhibits I used because I did drop them into Steno's DropBox.

THE COURT REPORTER:  No, if they are into Steno's DropBox, that's fine.  You don't need to do anything more.

MR. BLACKBURN:  All right.  Thank you.

THE COURT REPORTER:  You are welcome.  Ms --

MS. GRASSOTTI:  Grassotti.

THE COURT REPORTER:  Ms. Grassotti.

MS. GRASSOTTI:  Yes, we would like to order a copy of the transcript.

(Witness excused.)

(Thereupon, the deposition was concluded at 1:35 p.m.)

CERTIFICATE OF OATH

THE STATE OF FLORIDA

COUNTY OF MIAMI-DADE


    I, the undersigned authority, certify that MICHAEL DINICOLA personally appeared before me and was duly sworn.

        I further certify, that pursuant to FRCP Rule 30(e)(1), that the signature of the deponent  was requested by the deponent or a party before the completion of the deposition.




        WITNESS my hand and official seal this 21st day of May, 2026.




_____
MELANIE STINSON-KONSTANTINIDIS, RPR,
REGISTERED PROFESSIONAL REPORTER
Notary Public - State of Florida
My Commission Expires:  5/22/2029
My Commission No.:  HH655949

C E R T I F I C A T E

THE STATE OF FLORIDA

COUNTY OF MIAMI-DADE

        I, MELANIE STINSON-KONSTANTINIDIS,
RPR, Registered Professional Reporter, State of
Florida at large, do hereby certify that I was
authorized to and did report said deposition in
stenotype; and that the foregoing pages, numbered
from 1 to 129, inclusive, are a true and correct
transcription of my shorthand notes of said
deposition.

        I further certify that said deposition was
taken at the time and place hereinabove set forth
and that the taking of said deposition was commenced
and completed as hereinabove set out.

        I further certify that I am not attorney or
counsel of any of the parties, nor am I a relative
or employee of any attorney or counsel of party
connected with the action, nor am I financially
interested in the action.

        The foregoing certification of this transcript
does not apply to any reproduction of the same by
any means unless under the direct control and/or
direction of the certifying reporter.

        IN WITNESS WHEREOF, I have hereunto set my hand
this 21st day of May, 2026.

_____

MELANIE STINSON-KONSTANTINIDIS, RPR,
REGISTERED PROFESSIONAL REPORTER
Notary Public - State of Florida
My Commission Expires:  5/22/2029
My Commission No.:  HH655949

DEPOSITION ERRATA SHEET

MUHAMMAD

vs.

ALTO PHARMACY

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury

that I have read the entire transcript of

my Deposition taken in the captioned matter

or the same has been read to me, and

the same is true and accurate, save and

except for changes and/or corrections, if

any, as indicated by me on the DEPOSITION

ERRATA SHEET hereof, with the understanding

I offer these changes as if still under

oath.

Signed on the _____ day of

_____, 20___.


_____


MICHAEL DINICOLA

MICHAEL S. DINICOLA                                    JOB NO. 2707134
MAY 08, 2026

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____


SIGNATURE:_____DATE:_____

MICHAEL DINICOLA

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____


SIGNATURE:_____DATE:_____

MICHAEL DINICOLA

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____


SIGNATURE:_____DATE:_____

MICHAEL DINICOLA

**$**

**$21.50** 51:1

**0**

**00** 47:4

**1**

**10** 66:18,20 109:19

**10.3** 74:11

**10.52** 74:17

**100** 9:25 25:4,5 52:4 54:10 94:23

**100th** 34:13

**10306** 7:1

**10:00** 46:23,24 72:14 73:10

**10:15** 74:12

**10:46** 74:18

**11:14** 74:13

**11:46** 66:21

**12** 47:4

**12:00** 120:19

**12:01** 66:21

**12:11** 59:8

**12:14** 64:3

**12:15** 68:8 74:18

**12:22** 72:20

**12:30** 32:22,23 46:17 52:25

**12:36** 93:25

**12:40** 93:25

**12:45** 32:22

**12:51** 103:7,10

**12:58** 103:10

**14** 99:21

**14th** 118:10,14

**15** 26:1 52:9 54:2,4 109:19

**16** 62:25 80:6

**16th** 63:18 64:2 98:25

**17** 67:13

**17th** 68:7

**18th** 68:14 71:1

**19** 118:9

**19th** 64:8

**1:00** 46:18 103:6

**1:35** 125:23

**1:41** 68:14

**2**

**2** 58:18 59:7

**20** 80:7 109:19

**20.82** 74:24

**2022** 110:13 118:9

**2023** 8:12 88:5

**2024** 8:12 25:19 58:18 59:8,16 60:4,7 62:25 63:22 64:2,8 67:13 68:1,7,14 71:14 72:9, 12,20 73:20 74:7 75:9 88:5 94:14 98:25 118:10

**21** 71:14

**21st** 72:7,12

**22** 80:8

**22nd** 72:20 74:6 117:11

**23** 73:20

**23rd** 74:11

**24** 80:8

**24th** 74:17

**29th** 74:6 117:12

**2nd** 94:14

**3**

**30** 26:1 109:19

**36** 26:2

**3:00** 120:19

**3:26** 59:18 62:22

**3:30** 46:18

**3:36** 59:19 60:21 62:12,13

**3:45** 59:10 64:4

**4**

**43** 73:4

**45** 109:11,12

**4:00** 46:18

**4:30** 68:10

**4:50** 64:11 65:2,5,7

**5**

**5** 59:10

**50** 25:17,22 48:1

**50-foot** 47:24

**5:24** 59:9 60:21 62:13

**5:43** 64:10 65:4

**5:45** 72:13

**5:48** 68:16

**5:53** 64:4 65:2,7

**5th** 59:16 60:18

**6**

**69** 6:25

**6:00** 46:23

**6:06** 74:12

**6:47** 74:12

**6:49** 68:9

**7**

**7/16** 99:2

**75** 25:5,17,22

**7:00** 34:17,18 46:24

**8**

**8:00** 34:17

**8:17** 72:22

**9**

**98** 80:3

**9:00** 46:23

**9:53** 64:10

**9:54** 64:11

**9:58** 59:18

**A**

**a.m.** 59:18 64:10,11 66:21

**ability** 11:11 20:11 33:21,23 85:11 92:11

**accept** 113:2

**access** 11:1 88:18,24 116:11

**accident** 28:8 76:4

**accomplish** 83:22

**accomplishing** 84:2

**accordance** 20:25

**account** 68:21,25 114:17,23,24,25 115:3, 4,6,10,21

**accountability** 81:5

**accountable** 81:6 82:14

**accounts** 115:5,16 116:8

**accuracy** 14:11 76:10

**accurate** 13:20 20:24,25 66:1 107:25

**accurately** 13:25 14:4 48:3

**action** 15:19 119:5

**activity** 107:11

**actual** 31:1 86:4

**add** 93:9 108:13

**added** 24:19

**additional** 6:20 17:12

**adjust** 11:24 29:1

**adjusted** 40:15

**adjustment** 25:1

**adjustments** 24:2, 7,14 86:24 87:5

**admin** 68:15,19,23 72:21 73:8 85:11 114:15,22 115:2,5,15, 18,25 116:9

**ADP** 51:4

**advise** 22:1

**affect** 87:23

**Afiyfah** 61:22 91:18 101:1 106:3 118:19 119:3,14

**Afiyfah's** 49:7,14

**aforementioned** 66:23

**afraid** 17:18,23

**afternoon** 103:15

**agree** 7:12 79:4

**agreement** 99:17,18

**ahead** 22:15 26:16 32:14 42:4 45:23 48:9, 24 50:16 57:3 70:7 88:15 90:23 92:2 98:8 122:2 124:1,4

**alcohol** 6:17

**alleging** 100:14

**allocated** 80:12

**allowed** 32:3,5,23 40:9 47:18 51:11 108:10

**alphabet** 58:10

**alter** 16:24 33:21

**altering** 15:16

**Alto** 8:5,7 13:19 15:23 25:6 32:8,16 38:24 49:21 50:6,19 51:12,25 55:21,22 57:7 68:15,19 72:21 86:20 92:24 94:15 98:16,24 99:20 100:13 103:18,22,24 104:2,10 106:7,16,20, 24 107:7,23 108:5 110:23 113:16 114:15 115:2,18,22,23 118:9, 12 122:20,21 123:1,2

**Alto's** 51:3 52:12,16 89:21 91:10,21 92:4 93:17,23 94:15 95:1 104:5 113:11

**altogether** 22:17

**amend** 30:18

**amended** 32:25

**amendments** 30:17

**amount** 23:9,21 24:5 25:16 55:5 80:4,9 87:4

**Amy** 16:5,9,15,23 18:5,8,15 19:11,22 20:10 21:1,5 22:10,16, 20 23:1,13,16,23 26:10 27:6 28:11,25 29:3,20 30:25 34:3 42:24 43:10 44:4,21,24 69:1,6,8 70:1,2,11,15 75:18 78:12,16 79:22 80:2 81:21,23 82:20 84:11, 16 86:11,19 95:16 96:5 101:6,7,19,23,25 102:10 110:4,13,15,20 111:1,7,8 115:25 116:7, 10 119:22 122:16,20 123:20

**Amy's** 16:6,13,21 17:6,16,19 101:8 117:22,24

**and/or** 40:24 69:8

**answering** 10:18

**anybody's** 123:23

**anytime** 70:21

**apologize** 9:16 10:24 58:14

**app** 44:23 45:16 47:9, 13,14,17,21

**Apparently** 85:10

**appeared** 87:23

**appearing** 104:10

**appears** 31:7

**approached** 101:1 118:20

**approval** 55:22

**approve** 11:12,19 14:15 53:23

**approximate** 111:15

**approximately** 53:7 71:5 73:3

**April** 67:13 68:1,7,14 71:1 73:20 74:6,11,17 117:11

**area** 8:9,14 10:8 18:4, 9 19:3,17 23:2 26:12 44:4 82:2,6,9,11,17,23 88:9 92:18 93:10 96:16 106:14,18,22 107:16

**area-specific** 57:17,20

**areas** 24:19 82:2 92:21 96:14

**arrive** 52:5

**arrived** 36:1

**assigned** 31:18 32:1 49:21 91:21

**assignment** 91:11

**assistance** 7:6

**assume** 50:17 51:7

**assuming** 60:23 65:8 80:21 101:25

**assumption** 115:17

**assumptions** 73:13

**assure** 58:11

**attempt** 37:12

**attend** 50:20

**attendance** 67:25 102:13

**attorney** 7:13 103:16

**attorneys** 104:6,9 105:25

**authority** 34:2,10 41:14 78:15

**authorization** 33:6

**authorize** 77:12

**Avenue** 6:25 9:25 34:13 52:4 94:23

**average** 24:25 25:15, 21 80:4

**aware** 51:8 65:21 75:17,22 112:15

**B**

**back** 12:5 28:25 29:24 34:23 35:4 36:2,4 37:7, 14 41:11 52:25 53:21 54:17 56:1 66:23 95:8 100:22 103:6 107:21 109:4,17 112:7 121:14, 19 122:7,8 124:14,19

**bad** 80:22

**bag** 122:4 124:20

**based** 30:24 33:1 38:4,7 89:1 114:20

**basis** 19:12 26:20,21, 24 53:11,18 90:6 99:18 117:21 123:4,11

**begin** 6:19 13:25 14:5 31:12 121:19

**beginning** 37:15 48:5 50:21 102:17

MICHAEL S. DINICOLA
MAY 08, 2026

JOB NO. 2707134

116:5

**begins** 76:22

**behalf** 74:9

**belief** 20:21

**belongs** 61:17

**benefits** 13:21

**bi-weekly** 43:8

**bigger** 83:17

**bikers** 24:19,21 25:4

**bit** 9:17 81:15,23 101:18 104:22

**Blackburn** 5:12,14 10:3,12 11:4,17 12:10, 17 13:1,5 15:1 17:2,21 19:15 20:4 21:9 22:5,14 23:18 24:17 26:4,15 27:10,21 29:11 31:5 33:10 34:19 36:20 38:3, 15 39:6,19 40:22 42:3 43:9 45:22 48:8,23 49:9,19 50:1,15 51:22 52:10,20 53:4,14 54:23 56:7,20 57:2,16 58:20 59:5,14,24 60:5,13 61:20 62:2,4,6 63:2 64:15 65:6,23 66:6,9, 13,18,24 67:9,15,17 69:13 70:6 71:10,16,19 72:18 73:15,18,22 74:22 75:16 76:14 77:9, 18 78:1,10,20 80:10,16, 24 81:18 83:4 84:9,24 85:6,13 86:15,22 87:21 88:14 89:19 90:1,22 91:14 92:1,10,20 93:13, 21 94:3,8,10 95:10 96:11,18 97:20 98:3,7 100:11,20 102:7,15 103:11 104:13 105:11, 21 107:14 112:8,17,19 113:3,23 114:7 116:18, 19 118:14,16 120:7,9 122:1,13 123:25 124:4, 23 125:3,7,14

**blend** 46:9

**block** 52:15

**bodies** 83:24

**bonus** 17:24 83:15 84:6 88:6,11 89:9 93:9

**bonuses** 88:4

**boss** 16:5

**bottom** 75:2

**box** 35:18,20 36:1

**break** 6:8 66:10,12

**bridge** 52:1

**bring** 12:4 26:21 35:3 36:3,4,16 37:2,7 41:8, 10,18,24

**bringing** 36:10,13

**Bronx** 40:5,8,12

**Brooklyn** 24:20 40:5,7,10 93:4,6

**brought** 24:2 37:13 38:20 39:14

**budget** 21:7 22:3 89:1

**business** 32:8 92:13

**businesses** 93:16

**Bye-bye** 125:3

---

### C

---

**calculate** 13:20

**calculated** 48:3

**California** 8:22 9:7 18:11,19,24 19:6,7

**call** 24:6 30:19 90:25 99:8

**called** 45:25 95:12

**camera** 7:4

**cameras** 35:9

**capacity** 41:16

**capture** 38:25

**car** 79:4 109:5,17 124:17

**carefully** 5:25 98:25

**carries** 5:19 7:19

**carry** 63:25

**cars** 24:21,23 25:4

**case** 11:24 37:22 43:15 48:2 67:23 72:5 74:9 90:15 91:4 104:3, 10 106:4,12 107:2,5

**cases** 38:12,17

**caveat** 38:16

**cellular** 44:14

**certify** 14:10

**change** 11:11,20 14:21 15:24 30:23 55:25 61:5 65:11 107:9 115:7

**changed** 55:4,23

**changing** 59:18,19 64:10,11 68:16 72:22 87:11

**channel** 42:17,18,20, 23 43:1,3 44:3,6 70:8,9

**channels** 42:12,15, 16 43:21

**charging** 51:18

**chart** 58:14

**chat** 70:3,12,13,16

**chat-type** 44:5

**check** 32:5 53:17

**checking** 48:23

**chose** 113:1

**circumstances** 76:1

**cities** 57:22

**City** 9:21 109:14

**claim** 7:16

**clarify** 124:7

**class** 36:24 119:5

**clean** 29:13

**clear** 6:2,11 55:21

**clock** 32:8,16 34:8 109:7 121:14 122:8

**clock-in** 30:18,21 38:1,10 40:9 47:12,18, 22 53:8,10 55:16 59:3 63:15 68:4 121:11,12

**clock-out** 11:23 29:5 30:4 39:24 53:8 55:11, 18 60:21 61:10 63:15 65:1,14 68:5 73:9 75:11 107:9 108:10,22 109:5, 10,16 121:5,7,8,20 122:6

**clock-outs** 17:8 20:7 53:11

**clocked** 68:8

**clocked-in** 32:2,4 38:8 39:8 59:8 64:3 67:6 68:8 72:12 107:22 124:12,18,19

**clocked-out** 28:4 55:20 59:9 64:3 72:13 73:9 108:3

**clocking** 25:23 109:19

**clocking-in** 32:20 55:18 67:3

**clocking-out** 67:4 109:1

**close** 34:14

**closed** 34:16,24 35:5

**color** 46:4,8

**comments** 43:14

**communicate** 7:13 16:9 44:14 70:11 82:18

**communicated** 120:1

**communication** 16:11 69:24

**communications** 7:7 95:1 101:18 102:10 105:21,24

**company** 8:5 18:13 32:9 39:21 40:23 44:11, 17 79:4 93:20 96:9 99:14 100:23 109:18 115:20,22

**company-wide** 18:13

**compared** 87:19

**comparing** 86:4

**compensated** 36:9 37:23 121:22

**compensation** 79:11

**compensations** 88:4

**competition** 88:8

**complaining** 33:17

**complete** 31:11 109:9,23 120:23

**completed** 12:3 31:15 39:9 56:14 108:16

**completely** 5:22

**completing** 56:18 108:25 120:16,18

**completion** 56:23 107:10 108:14 109:25

**concern** 29:20

**concerned** 22:7

**concerns** 20:10

**concluded** 125:22

**confirm** 40:13 60:10 61:25

**confirming** 105:18

**connection** 104:6

**consent** 77:14

**considered** 32:7 40:14 97:16 109:18 112:5

**consistent** 72:14

**consult** 7:16

**contact** 61:1 62:10, 14

**contacted** 62:19 69:18

**contents** 13:14

**continue** 26:11 33:20 99:1 105:8

**contract** 42:6 57:14 98:24 99:16

**contractors** 90:4

**contracts** 94:17,22 98:17

**control** 52:17 114:23

**conversation** 45:7 90:9 95:15,17 96:13,24 119:10

**conversations** 22:10 28:1 43:6,12 44:16,24 45:7 83:3 97:3 119:20

**cool** 103:9

**coordinated** 46:5

**copies** 86:18

**copy** 13:13 88:22 125:20

**corporate** 18:21,25

**correct** 14:23 21:2,3 33:7 34:13 38:20,21 41:15,18 42:1 44:8,14 49:22 51:19,21,24 52:17,22 59:11,20,25 60:10,18 64:12,22,23 71:7,9,11,12 72:15,17 73:5,6 75:12 76:12 77:6,24 78:7,9,12,13, 17,19 80:13,15 83:9,10 85:1,10 90:20 91:22,24 92:3 93:23 98:5,9 99:15,19 100:6 101:15, 16 108:18 113:4 122:9, 10

**corrected** 77:19

**correction** 29:22

**correctly** 13:22 14:6, 12,18 15:13,21 24:10 56:16 58:7 64:5 68:11, 17 72:23 74:14,19 75:3 77:2 86:11 94:19 97:5 99:10

**correspond** 108:21

**cost** 17:11 21:12,15 22:8 26:12 79:14 81:7 122:17

**cost-cutting** 27:8 43:11

**costs** 17:25 20:12 23:1

**counsel** 5:14 103:17 114:9 117:7

**counseled** 77:20

**count** 24:24

**country** 42:19

**couple** 28:15 53:6 95:23 110:19

**courier** 13:10 14:22 15:5,11,25 34:21 35:1 38:7 40:24 56:14 58:2 69:19 70:11 75:23 76:18 77:1 88:20 94:17, 22 98:14,17 102:14 106:15,19 107:9,15,17 114:2 124:8

**courier's** 14:9,21 15:24 16:25 33:22 53:8 61:18 77:13 84:17 114:12

**couriers** 9:20,25 11:2 12:6 13:24 14:4 25:2,7 33:5 34:11 41:3, 15,17 42:8 43:4 44:18 45:10 49:21 50:11,19, 25 51:3,11,16,25 52:5, 12 54:3 55:3,11 56:10 57:9 67:2,5 69:9,24 87:2 88:23 89:21 91:6, 9,20 92:4,11 93:14 94:15 98:5 99:21 100:13 101:21 106:7, 12,23 108:7,13,25 110:1 112:15 113:1 120:17 121:2 124:11

**couriers'** 54:19 77:20 78:3,23 86:25 87:22

**court** 5:24 6:5 13:1 66:22 107:20 125:4,11, 15,18

**courtroom** 5:20

**cover** 90:14

**covering** 123:9

**CPAP** 97:15

**crazy** 58:16

**create** 45:12,13,24

**created** 42:13 45:17 47:2

**credit** 40:3

**criticized** 89:14,17

**CROSS-EXAMINATION** 103:13

**customer** 48:21 51:16

**customer's** 40:11

**customers** 51:18

**cut** 17:25

**cutting** 17:11 20:12

---

**D**

**D-I-N-I-C-O-L-A** 8:3

**daily** 53:15,17 81:16, 19 90:6 110:1 117:21 123:11

**Dallas** 19:4,7

**Darren** 106:23

**dates** 118:9,11

**Dave** 99:9,12

**day** 13:15 28:3 29:16 35:3 36:4 37:14,18 42:14 46:2,6,10,22 47:4 48:6 53:18,23,24 62:16 65:19 85:15 87:3 90:14, 15 96:23 98:10 120:24 125:2

**day-to-day** 91:8

**days** 84:6,8 99:21 123:13

**dealings** 91:8

**decision** 94:16,22 96:10 97:12,13 98:16, 19

**decisions** 88:25 98:21

**dedication** 99:5

**deep** 88:3

**deepest** 99:4

**defendant** 103:18

**defendants** 61:23 63:23 72:3 74:8

**definitively** 101:24

**deleted** 105:6

**deliver** 37:12 94:15 122:4

**delivered** 39:10 84:14 97:6

**deliveries** 20:7 24:13 31:23 83:7,23,24 98:11 108:8 120:17,18

**delivering** 48:4 52:2

**delivery** 17:9 24:13 29:10,15,18 30:5,7 32:3 34:22 38:2 39:15 40:1, 13 42:13 46:2,10,14,15, 16,19 47:3,5 48:11,14, 20 55:10 62:22 76:11 78:5,7,25 79:6 84:23 89:4 91:1 93:15,17,23 98:22 99:1 107:24 108:4,15,16 109:1,16, 20,21 120:20 121:7

**demand** 86:17

**Denver** 8:23 9:12 10:6 27:2 44:1 57:19 123:18

**departed** 122:20

**departure** 123:1

**depending** 26:2 37:19 97:13

**deposition** 5:4,18 7:8,15,19 100:19 102:18,21,25 103:25 104:6,14,16,22 105:13, 18,22 106:1 111:20 125:22

**describe** 31:6

**determine** 76:25 97:9

**determined** 77:5

**device** 44:14

**difference** 46:12

**differently** 91:9

**difficult** 94:16 98:16

**Dinicola** 5:9 7:25 12:20 13:6 59:17 60:14 61:19 63:5 64:9,17 67:18 71:20 73:23 86:21 94:11 102:11 112:11 124:7

**direct** 5:11 69:24 110:16,18

**directive** 16:24 17:16,19 18:5,8,13 20:12,15 21:1,19,20 23:12 43:17 82:13

**directives** 23:15 70:15 82:19

**directly** 51:18 70:11

**disciplinary** 15:19

**discipline** 91:11

**disciplined** 77:19 82:7

**disclosed** 86:21

**disclosures** 61:24 63:24,25 72:4 74:8

**discovery** 61:24 63:24 86:17

**discuss** 28:6,8 118:20

**discussed** 30:25 69:4

**discussion** 12:14 77:8

**discussions** 23:8 43:4

**dispatch** 75:18

**dispatched** 52:6,12

**dispatcher** 34:8 35:12 41:6 84:16

**dispatchers** 33:21 34:9 35:7 41:9,14 42:7, 25 45:10 50:8 70:16 97:23

**display** 12:8 49:5 58:8,15 67:11 71:16

**displayed** 92:6

**displaying** 12:18 63:3 67:15 71:17 73:18 94:8

**document** 12:21 13:7 15:16 54:24 59:23 60:15 63:6,12,14,24 64:17 67:19,22 68:3 71:21,23 72:1,3,4,9 73:24 74:1,4 94:12 113:10,25 114:2,9,14 116:17,20,21 117:1,6,8, 10

**documented** 56:22, 24

**documents** 63:23 67:6 74:7,8 102:20

**Dominique** 106:19

**Dongan** 6:25

**door** 35:6,9,13

**drive** 38:23 92:18,22 121:18,23 122:7

**driven** 41:22

**driver** 25:12 28:22,23 29:4,17,24 30:19 31:1,7 35:8,10,13 37:18,23 39:7,12 40:1,3,4,17 48:11,18 83:6 101:3 120:16,23

**driver's** 29:4,21,23 48:3

**driver@alto.com.** 99:9

**drivers** 17:12 23:22 24:3,11 25:23 27:3,4 30:21 34:5 35:16 36:5, 9,25 37:11 38:6 41:2 47:10,18,22 57:13,21 79:16 80:12 82:25 83:6, 12,17 84:5 88:23 91:5 93:6,20 97:8 100:25 102:13,14 107:22 109:5,6,9 119:8,15 123:12 124:16

**drivers'** 24:8 53:12

**driving** 81:24 124:14

**drop** 12:3 24:24 33:19 35:10 37:18 38:18 39:24 40:21 42:12

45:13 48:14 60:24 76:7, 8 89:4 125:10

**drop-off** 38:23 39:1 40:5,7

**Dropbox** 35:11 47:7 125:10,12

**dropped** 12:11 124:20

**dropping** 38:12

**drops** 23:9,20 24:5,25 80:4

**drunk** 6:17

**duration** 112:3,13,16

---

**E**

---

**earlier** 19:24 24:12 33:2 38:5 39:12 41:13 45:9 54:4 62:7 69:4 72:4 74:9 76:16 78:14 82:1 88:2 91:16 105:17 107:13,14,19 118:18 120:14 122:16

**early** 30:22 31:21 46:14 52:9

**earnings** 51:18

**easier** 10:16

**edit** 53:8,21 62:8 65:17 68:15 71:1,5 72:21 73:1,3 107:8

**edited** 53:12 59:17 64:9 68:15 72:21

**editing** 26:6 53:6 101:22

**edits** 53:12 54:18,20, 25 59:16 60:17 64:8,22 66:2 69:8,19 87:22 89:1

**effect** 5:19 7:20

**efficiency** 79:14 98:23

**elaborate** 11:13

**eligible** 88:3

**eliminate** 22:17

**email** 54:25 61:9 94:1, 14 98:13 99:9,15 125:8, 9

**employed** 8:4 69:25 103:21 118:12 122:21

**employee** 13:21 49:15,21 50:3,5,11 91:19 113:14

**employee's** 15:18 62:9

**employees** 91:10 93:19

**employment** 10:25 15:20 22:23,25 44:10 91:21 107:7 118:9 119:6

**employment-related** 92:5

**encouraged** 78:2,4

**end** 14:1,5 53:25 72:14 80:7 82:12 90:8 95:24 98:24 124:10

**ended** 28:5,21 42:5 121:17

**ends** 79:7

**enforcement** 15:15

**enhancing** 98:22

**enlarge** 12:24 63:9

**ensure** 24:15 98:21

**enter** 54:19

**entered** 48:16,19

**entire** 10:9 39:13 40:18

**entries** 21:6 55:24

**entry** 14:22 15:25 59:7,15 61:2,22 63:17 64:1,7 67:25 68:6,13 72:1,6,11,19

**error** 14:23 15:5,10 16:1 61:2

**essentially** 10:9

**EST** 68:15,19 72:22 73:8 114:15 115:2,5

**evaluated** 79:13

**evening** 46:20

**event** 15:4,10

**evidenced** 29:16

**exact** 25:20 81:4

**EXAMINATION** 5:11

**Excel** 86:6,10,18,23

**exclusively** 107:23

**excused** 125:21

**executed** 83:8

**executive** 86:20

**exhibit** 12:9,15,18 13:2,3,4 49:5,7,11,13 58:9,11,13,18,22,25 59:6 61:17 62:24,25 63:3,16 65:24,25 67:11, 12,13,16 71:2,14,17,18 73:19,20 76:16,17 91:16,20 92:7 94:1,4,9 112:7 113:8,21 114:1,6, 10 116:15,18,21 117:4, 7

**exhibits** 12:11 58:9 75:7,13 77:4 125:9

**expanded** 10:8

**expect** 19:23 83:1

**expectation** 108:19

**expectations** 86:12

**expected** 52:5,8 107:22 112:13,16

**explain** 12:2 17:10 23:23 90:2 99:20

**explanation** 28:25

**explicit** 33:6

**exposure** 22:9

**express** 22:19 27:6 84:11 99:4

**extend** 11:21

**extent** 124:8

**extra** 90:18 91:6

**extreme** 55:5,7

**eye** 70:20

---

**F**

---

**face-to-face** 43:8, 20

**failed** 17:19 41:7

**failing** 82:8

**falsifying** 15:17

**familiar** 113:10

**favorable** 89:11

**February** 58:18 59:7, 16 60:6,18 62:25 63:18 64:2,8

**federal** 100:14

**feedback** 99:8

**feel** 20:10 78:15 81:9

**feet** 48:1

**field** 122:7

**fields** 55:13

**fifteen** 109:4

**file** 119:4

**filed** 100:13,18 101:14

**filing** 101:1

**finally** 111:3

**find** 28:3,23 30:8 107:21

**fine** 103:6 125:12

**finish** 11:20,25 12:1 22:15 39:5

**finished** 6:1 40:20

**firing** 97:1

**firm** 103:16

**five-minute** 109:15

**fixed** 50:25

**flew** 19:7

**Florida** 5:7

**focus** 23:7 78:6

**focusing** 77:10

**follow** 17:19 20:11

**follow-up** 66:25 112:12 120:13

**foot** 81:22

**force** 5:19 7:20

**forcefully** 22:20

**forgot** 11:23 30:20 34:5 55:14 109:5

**form** 10:2,11 11:3,16 14:24 17:1,20 19:14 20:3 21:8 22:4,12 23:17 24:16 25:24 26:13 27:9, 17 29:6 31:2 33:8 34:15 36:17 37:24 38:9 39:2, 16 40:16 42:2 43:5 45:21 48:7 49:17,23 50:13 51:20 52:7,19,23 53:9 54:21 56:4,15 57:1,10 59:1,12,22 64:14 65:3,20 66:4 67:7 69:10 70:4 71:8 72:16 73:11 74:20 75:14 76:13 77:7,15,25 78:8, 18 79:24 80:14,20 81:12 82:21 84:3,20 85:3,9 87:16 88:13 89:16,23 90:21 91:12, 23 92:8,15 93:1,18 95:4 96:7,15 97:19,25 98:6 99:23 100:7,16 121:3, 24 122:11

**fourth** 15:8

**Francisco** 19:3

**free** 10:20 52:21 108:3 110:1

**freedom** 31:22 90:4 92:16

**frequent** 26:19 28:14

**frequently** 26:17

**Friday** 59:7 63:17 64:2

**frustration** 82:18

**full** 7:20,24 9:9 26:1

**function** 11:14 45:20

MICHAEL S. DINICOLA
MAY 08, 2026

JOB NO. 2707134

## G

**gas** 81:22

**gave** 21:16 33:6 112:24 119:24

**geared** 96:1

**Geo** 55:14

**geo-fence** 47:24 55:17

**Geo-location** 48:18

**gestures** 6:4,6

**Gilead** 9:4

**girl** 9:12

**girl's** 8:23

**give** 22:21 70:15 91:16 93:12 96:8 103:2,5 105:15

**giving** 84:5

**goal** 22:18

**goals** 81:25

**Gonzalez** 101:4 118:19,23 119:9,16,20

**good** 5:13 63:11 103:15 125:2

**granted** 92:25

**Grassotti** 10:2,11 11:3,16 14:24 17:1,20 19:14 20:3 21:8 22:4,12 23:17 24:16 25:24 26:13 27:9,17 29:6 31:2 33:8 34:15 36:17 37:24 38:9 39:2,16 40:16 42:2 43:5 45:21 48:7 49:17, 23 50:13 51:20 52:7,19, 23 53:9 54:21 56:4,15 57:1,10 59:1,12,22 60:3 61:14 64:14 65:3,20 66:4,8,11,16 67:7 69:10 70:4 71:8 72:16 73:11 74:20 75:14 76:13 77:7, 15,25 78:8,18 79:24 80:14,20 81:12 82:21 84:3,20 85:3,9 87:16 88:13 89:16,23 90:21 91:12,23 92:8,15 93:1,

18 95:4 96:7,15 97:19, 25 98:6 99:23 100:7,16 103:14,16 112:6,9,10, 21 113:5,6,21,24 114:5, 8 116:14,16 117:3,5 118:15,17 120:5 121:3, 10,24 122:11 124:2,6 125:17,18,19

**gratitude** 99:5

**greens** 46:5

**group** 44:5 70:2

**Grubhub** 31:23

**guess** 29:12 40:11 43:2 48:18 50:14,18 60:19 89:13 103:4 122:6

**guys** 21:15 26:23 32:1 41:24 56:13 83:6 125:2

## H

**half** 24:10,11 55:9 109:10,12

**halfway** 76:23

**handed** 82:20

**handful** 96:23

**handled** 56:12

**happen** 53:11 81:17 83:2 84:8 85:1 95:18 123:19

**happened** 28:7,24 121:1

**happening** 28:10

**hard** 99:5

**head** 6:3,4 16:8 24:24 37:17 75:21 99:13

**heading** 124:18

**headquarters** 18:22 19:1

**hear** 70:18

**hearing** 70:17

**held** 12:14 77:8 81:6 82:14

**hey** 28:16 30:20 34:5 41:6 43:14 48:12 91:2

**high** 89:15 97:6,10,16

**higher** 80:3

**Hills** 6:25

**hire** 49:22

**hired** 8:13,18 9:15 110:11,15,17

**hiring** 110:18

**history** 59:7,15 61:22 63:17,22 64:1,7 67:25 68:6,13 72:1,6,19

**hit** 81:10 83:1

**hitting** 81:6,25

**hold** 8:7 26:8 49:2 75:1 76:20

**home** 36:6,10,13,16 37:3,7,10,13 38:20 39:14 40:6,10,12,25 41:4,8,10,18,24 42:8 45:11 79:9 108:11

**honestly** 6:14 62:21 78:24

**hospital** 32:6

**hour** 24:11 51:1 54:14 55:9 58:6 62:15 65:18 71:5 73:4 109:11,12 121:18,23

**hourly** 50:25 51:12

**hours** 11:12,20,22 22:2 25:21 26:2 29:9 31:1 33:15 46:25 53:16, 23 54:1 61:13 74:12,18, 24,25 75:20 76:25 77:5, 21 78:3,23 79:13 86:4, 5,12,25 87:1 89:11,14 101:21 112:1,14

**house** 6:25 38:1 40:19

**Howard** 16:17 19:25 20:2

**HR** 16:20 56:11,25

**huge** 83:23

## I

**ID** 49:15,21 50:4,5,12, 18 91:19,21 113:14

**identification** 12:16 49:8 58:19 63:1 67:14 71:15 73:21 94:2

**identified** 59:17 60:14 64:9,17,20 68:15 72:21

**immediately** 15:6, 11

**implement** 27:8

**implemented** 35:15 70:22

**in-person** 7:20 19:6

**inaccurate** 65:15

**incentive** 17:24 88:4,16 89:9

**include** 18:10 107:16

**included** 96:14,17

**including** 5:15 7:13 9:24 15:20 44:17,20 92:5 94:18 98:18 100:13

**increase** 23:20 51:17 75:19 76:8

**increased** 75:25

**increases** 80:4

**increasing** 24:4,24 81:8 96:1 98:23

**incurred** 52:1

**independent** 90:3 92:13 93:15 99:16

**indicating** 61:10,17 65:14

**indication** 47:5 61:15

**individual** 55:25 87:2

**influx** 83:23

**inform** 62:15,19

MICHAEL S. DINICOLA
MAY 08, 2026

JOB NO. 2707134

**information** 13:16 30:8 88:19 101:5

**informed** 97:23 98:2, 5,9

**informing** 94:15

**initial** 96:23 97:3

**initially** 57:18

**instance** 75:10,17

**instances** 109:2

**instant** 120:2

**instruct** 41:10 102:23 107:8

**instructed** 20:2 29:3,22 30:23 31:3 124:12

**instruction** 17:7 28:18 37:1,8 43:11 78:11,16 102:4 108:20 121:2 122:15

**instructions** 101:22 102:11

**invoice** 51:6

**involved** 94:21

**involvement** 70:25 72:25

**Island** 7:1 10:5 27:1 42:20 43:25 123:12,17

**issue** 28:19

**items** 6:20 37:6 97:6

### J

**J-A-E** 9:1,2

**J-A-Y** 8:25

**Jacksonlewis** 103:17

**Jae** 8:21 18:10 116:6

**Jae's** 9:2

**jammed** 106:9

**Jay** 8:25

**job** 20:16,22

**Joe** 8:21 9:5,6 18:10

**Joseph** 9:8,10

**Josh** 16:17,23 19:24 20:10 21:2 22:1,10,19 26:8,9,10 27:6,23 29:3, 20 30:25 42:24 43:10 44:21,24 45:5 69:2,6,8 75:18 78:12,16 79:22 81:21 82:20 86:19 95:16 96:5 101:6,19,23, 25 102:10 110:8 111:3 115:25 116:11 122:16, 23,24 123:22

**Josh's** 16:18 20:11, 15

**judge** 5:21

**July** 25:19 94:14 98:25 118:9

**jump** 115:5

**jury** 5:21

### K

**keeping** 22:8 83:19 89:11 122:17

**kind** 24:7 27:7 36:25 82:18 88:18

**kinds** 83:20

**knew** 17:23 33:18 81:14 90:3 100:10 124:16

**knowing** 56:14

**knowledge** 18:3,21 57:5 69:17,23 71:1 73:1

### L

**labor** 79:13,14 85:22 86:1 87:24 89:2,14

**laptop** 16:10 44:12

**large** 5:7 62:8

**late** 28:21

**Lauren** 10:13,18 103:4,15

**law** 103:16

**lawsuit** 100:14 101:2, 14 103:18 118:21

**layoff** 96:6

**learn** 29:24 85:14 100:12

**leave** 20:19 25:12,18 35:11 48:12 51:14 52:21

**leaving** 48:13 94:25

**led** 20:20

**left** 25:6 35:2,13 38:1 40:1,19 48:4 95:19 96:25 100:5

**leftover** 38:19 47:6

**letting** 24:1 82:13 98:15

**lightly** 98:20

**limit** 23:22 55:19

**linked** 56:19

**listen** 5:25 10:22 59:24

**lived** 40:5

**lives** 110:2

**Liza** 101:4 118:19

**located** 6:23 14:2 18:21 19:1 23:24

**location** 18:17 34:12, 14,23 35:18,20 85:21, 25 94:17,23 98:17

**locations** 9:23 27:1 123:10,16

**lock** 35:12

**locks** 35:6

**log** 116:8

**log-in** 34:7 38:22

**logged** 53:19

**login** 47:10 68:23

**logistics** 99:14

**long** 10:5 27:1 28:4 42:20 43:25 52:24 58:2, 6,7 66:15 110:7 123:12,

17

**longest** 111:6

**loss** 88:19

**lost** 20:16

**lot** 30:16 48:25 83:7

**loud** 6:2

**low** 83:19 89:11 122:17

**lowering** 96:1

### M

**machine** 97:15

**Madam** 13:1

**made** 25:1 27:12 29:10 39:15,23 40:20 46:8 54:18,20 57:11 60:17,25 62:22 64:21 66:1 67:23 78:7 79:5 83:24 86:24 87:5 92:23 94:16 97:12 98:16,20 121:6

**main** 24:23 68:21,25 114:17

**make** 6:2 17:8 20:6,24 24:1,8,14 28:9 29:22 30:3 31:23 34:22 40:1,7 48:13 49:1 61:5,21 65:11 69:8,12 71:25 72:8 74:3 76:8 81:10,16 83:24,25 85:11,18 88:25 98:20 115:7

**makes** 99:16

**making** 24:12 28:9 34:22 69:15,20 86:16 96:9 98:11

**management** 43:3 95:2

**manager** 8:9,14 18:9 110:5 111:6,11

**managers** 19:18 44:4 82:2,6,9,11,17 88:9 96:14,16 111:5

**mandatory** 50:20

**Manhattan** 10:1

23:24 88:20

**manpower** 84:13

**March** 118:10,14

**margins** 89:2

**marked** 12:9,16 13:2 49:8,10 58:19,22 61:16 63:1 67:14 71:15 73:21 76:15 94:2,4 113:8 114:1,10 116:18 117:6

**marking** 116:20

**mass** 95:2,6 96:5 97:1

**match** 78:5 84:23 107:10 109:2

**matched** 17:9 20:8 30:4 78:24

**material** 56:6

**matter** 5:15

**meaning** 41:23 42:16

**means** 5:21 7:10 12:2

**measures** 27:8 43:11

**medication** 6:15 32:18 35:2,4,11 36:13, 21 37:2,3,4,19 40:25 42:8 45:11

**medications** 36:6, 15 37:12

**meet** 23:1 80:17 82:8 87:24

**meeting** 70:18,23

**meetings** 16:12 23:16 26:19 43:8,19 69:5,6 116:7

**Melania** 110:19,24 116:6

**Melanie** 5:4 12:10 122:14

**Melanie's** 118:2,6

**mentioned** 9:5 19:24 38:5,16 39:11 42:15 62:7 82:1

**message** 28:16 98:15 102:1 104:18,20

105:10,17 120:2

**messages** 7:7 43:14 45:4 105:4,19

**method** 120:3

**metric** 89:6

**metrics** 79:20 80:18 81:7,11,24 82:8,19

**Michael** 5:9 7:25 59:17 60:14 64:9,16 102:11 124:25

**middle** 15:8 106:10

**Mike** 61:19

**milk** 109:6

**mind** 112:6

**minuets** 66:20

**minute** 71:6 103:3

**minutes** 52:9 54:2,4 66:14,15,19 73:4 109:4, 11,12,19,20

**misclassification** 100:14

**missed** 75:20

**mistake** 28:8

**mobile** 59:9 64:4 68:9 72:13

**mom** 32:6

**Monday** 53:20 59:16 64:8

**monitor** 37:1 38:25 45:16

**monitoring** 85:20, 25 102:12

**month** 9:14 19:11 23:6 25:10,18,20 26:18 66:3 87:9 95:19 110:19

**monthly** 26:12 69:5

**months** 25:11 35:21 87:20 95:24,25 100:5,9 110:6 111:11,13

**morning** 5:13 28:6 38:13,18 39:11,15,25 40:8 46:14

**move** 75:2,5 90:9 93:3

**moved** 16:21,23 24:9, 10

**moving** 32:10

**Muhammad** 5:15 59:8 61:1,5,22 62:14 63:20 64:2 67:24 68:7 69:18 72:2,12 74:9,11, 17 75:23 100:13 106:3, 15 118:19 119:12,17,21

**Muhammad's** 60:20 66:2 71:6 72:4,10 73:4,8 74:5 75:8,10,19 77:5 91:18

**N**

**named** 8:5 75:23

**names** 8:20 43:22,24

**narcotic** 36:24

**narcotics** 36:16,22 97:16

**nature** 86:14

**needed** 21:22 28:22 29:1 53:22 57:8,12 93:5 105:1,15

**negotiate** 51:11 92:12

**nevermind** 12:7

**news** 99:3 101:12

**night** 39:1,8,24 47:6 48:5

**nod** 6:3

**noose** 95:21

**normal** 121:4

**Notary** 5:6

**noted** 60:11 62:5

**notes** 7:7 9:17 48:24 55:1 103:3

**notice** 99:22

**notified** 42:11

**notify** 41:3 55:3 62:10 69:14,19

**number** 23:20 24:5, 20 25:15 50:5 123:20, 24

**numbers** 23:5 43:16 49:21 50:4,12,18 83:1 87:8,11,14,18 88:10 89:18

**O**

**oath** 5:19 7:21

**object** 10:2,11 11:3, 16 14:24 17:1,20 19:14 20:3 21:8 22:4,12 23:17 24:16 25:24 26:13 27:9, 17 29:6 31:2 33:8 34:15 36:17 37:24 38:9 39:2, 16 40:16 42:2 43:5 45:21 48:7 49:17,23 50:13 51:20 52:7,19,23 53:9 54:21 56:4,15 57:1,10 59:1,12,22 61:14 64:14 65:3,20 66:4 67:7 69:10 70:4 71:8 72:16 73:11 74:20 75:14 76:13 77:7,15,25 78:8,18 79:24 80:14,20 81:12 82:21 84:3,20 85:3,9 87:16 88:13 89:16,23 90:21 91:12, 23 92:8,15 93:1,18 95:4 96:7,15 97:19,25 98:6 99:23 100:7,16 121:3, 24 122:11

**objection** 10:14,19 60:11 62:4 112:17 113:3

**objective** 13:18

**occasions** 66:3

**occurred** 75:22 77:23

**off-the-record** 12:14 77:8

**offer** 83:14

**offered** 17:25

**offerings** 98:22

**on-time** 80:2

**Onfleet** 30:9,10,11 31:4 33:1 44:18 45:14,

15 47:2,9 48:10,14,17 107:11 108:17 109:22 115:19

**online** 50:23

**open** 35:9

**operating** 93:15

**operation** 88:20 93:17,23

**operations** 99:14

**opposed** 30:25

**opposite** 77:23 89:13

**option** 17:15

**order** 22:3 105:2 121:14 125:20

**organized** 42:21

**orientation** 50:20

**original** 61:10 65:14

**originally** 16:19 96:21 113:9

**outcome** 80:18

**outline** 58:15

**overtime** 22:9,11,17 24:6,15 43:15 79:14 80:9,12 83:9,19,25 84:7,17 95:21 96:1 111:21,22 112:1,5

**P**

**p.m.** 59:8,9,10,19 60:21,22 62:12,13 64:3, 4,10,11 65:2,7 66:21 68:8,9,10,14,16 72:13, 14,20,22 73:10 74:12, 13,18 93:25 103:10 125:23

**package** 12:4 36:3 38:19 39:8,10 40:12 41:3,6,8,11 48:4 79:3 97:9,13 122:3 124:9,11, 15,17

**packages** 24:22 36:6,10 38:18 41:18,24 79:9 82:25 84:13 96:2,

22 97:7

**paid** 33:18 38:7 39:12, 18 40:18 50:25 51:3,5, 10 54:4,8,9,12,14 74:24 79:5,9 80:9 109:11

**paragraph** 13:18 15:9 76:23

**Park** 9:25 34:13 52:4 94:23

**part** 57:14,24 61:24 63:24 67:22 70:2 72:3 74:7 81:21 89:21 93:16, 22 96:13

**parties** 12:19 63:4 67:16 71:18 73:19 94:9

**partnered** 95:8,11

**partnership** 96:3 98:10

**passed** 111:24

**past** 98:21

**patients** 98:23

**pause** 10:15

**pay** 13:21 17:11 38:6 92:12

**paycheck** 51:9

**payroll** 14:16 51:4 55:1 85:22 86:1

**pending** 6:9 7:15

**people** 98:4 116:11

**percent** 54:10 80:3

**perfect** 6:13

**performance-based** 88:5

**period** 8:10 74:24 111:6

**periodically** 69:12

**permissions** 11:7,9 115:7,16

**permitted** 15:24

**person** 7:9 10:16 68:24 96:12 108:22 117:13

**personally** 32:10 78:22 79:6

**pertains** 20:12 122:17

**pharmacies** 47:8 123:3

**pharmacist** 97:12

**pharmacy** 8:5,8 35:4,5 37:14 41:12 42:12,16,19 43:25 47:11,23,25 70:9 94:16 97:11 98:16,24 103:18 108:8 121:14,19 122:7 124:11,19

**phone** 7:9 44:11,12, 20 120:2 123:20,23

**phrase** 55:14

**physical** 84:13

**physically** 6:23 7:3 47:22 48:19

**pick** 83:13 91:6 92:17, 21 99:1

**picked** 26:3 83:15

**pile** 53:24

**place** 6:19 43:7

**places** 57:20

**plaintiff** 67:23

**plaintiff's** 114:10 117:7

**plaintiffs** 5:14 105:25

**plan** 96:24 97:2,3

**planned** 49:1

**platform** 12:12 102:3

**plural** 42:16

**point** 22:22 24:24 35:14,19 40:3 42:13 120:22

**policies** 92:5

**policy** 12:15 13:10, 13,24 14:20 15:4,16 26:11 32:9,12,13 43:19 70:21 76:18 77:11

**Policy-wise** 32:15

**Portillo** 118:3 122:14

**portion** 12:24 63:9

**position** 8:7 16:21,22 19:11 20:19 110:10

**potential** 102:24

**praise** 89:10

**premises** 52:12

**preparation** 102:21

**prepare** 102:17

**prescriptions** 52:2

**present** 7:2

**preserve** 105:8

**pressure** 27:7 81:16, 19 83:19

**pressured** 81:10 89:18

**pretty** 45:6

**previous** 87:19 112:12 119:6

**previously** 8:4 113:8 114:1,10 116:18 117:6

**prices** 51:17

**prior** 87:8,9 94:25 116:19 117:7

**privilege** 7:16

**problem** 9:11 15:6, 12 61:20 62:23 66:19 103:9

**proceeding** 5:18 6:21 7:19,21

**process** 31:8 34:22 35:15,25 60:9 120:16, 18

**processes** 43:18

**processing** 14:17

**production** 81:8

**productions** 67:22

**productivity** 79:15 80:11

MICHAEL S. DINICOLA
MAY 08, 2026

JOB NO. 2707134

**Professional** 5:6

**profile** 49:7,14,16

**profit** 88:19

**profitability** 89:2

**program** 30:24 88:16

**programs** 57:9

**prompts** 7:8

**proper** 76:21

**protest** 33:11

**provide** 21:13,14 43:10 44:11 48:17 51:6 56:8 57:7 86:3 102:4 108:3 122:15

**provided** 18:4,7 21:1 23:12 34:1 36:25 61:23 63:23 72:3 78:11 96:5 102:12 106:15,19,23 121:2 122:16

**providing** 107:23

**provision** 99:17

**Public** 5:6

**pull** 47:1 86:15 91:17

**punch** 30:20 34:6

**punch-in** 30:20 31:1, 13 32:23 34:6 47:13 69:7

**punch-out** 29:21,25 30:4,17 36:12 69:7 78:5

**punch-outs** 38:14

**punched** 29:17 76:3, 6

**punched-in** 31:19

**punched-out** 31:19,20,21

**punching** 120:15

**pushing** 21:20

**put** 58:17 97:8 113:21 114:5 116:14 117:3

**putting** 112:7

**Q**

**Queens** 24:20 93:5,8

**question** 5:22,25 6:1,6 7:15 20:9 27:5 29:13,19 33:14 47:17 63:25 66:23 67:1 73:7 85:18,24 112:12 114:11 124:3

**questions** 6:10 12:24 48:25 53:6 58:10 63:10 75:6 99:7 103:5, 12,19 107:14 120:13

**quick** 56:1 58:17

**R**

**raised** 29:20

**range** 25:25

**rarely** 53:10

**rate** 51:1,12 80:2

**rates** 92:12

**reach** 28:5,22,23 81:15 83:12 91:2 93:5

**reached** 41:5

**reaction** 101:8,9

**read** 13:17,22 14:6,12, 18 15:13,21 64:5 66:22 68:11,17 72:23 74:14, 19 75:1,3 77:2 94:19 98:12,25 99:10 107:21

**ready** 32:19

**real** 56:1 58:17

**reason** 6:13 21:14 29:5 34:7 54:19 65:1 95:2 96:4,9 107:9 122:25

**reasons** 21:16 54:25

**recall** 19:19 27:25 33:13,16 45:5 61:3,6,11 69:16 84:22,25 91:15 101:3 104:19 107:20 108:18 116:23

**receive** 31:25 40:3 89:10 95:1 101:21

**received** 51:8 98:15 99:21 104:25

**receiving** 7:6 21:19 27:7

**recess** 66:21 93:25 103:10

**recognize** 13:6 63:12 68:2 71:23 74:1

**recollection** 13:12 17:6 20:1 21:4 25:15 34:20 49:20 50:9 61:4,8 65:10 67:2 70:10,14,25 82:5 117:24 118:4,11 122:19

**recommendation s** 57:12

**record** 6:2,10,20,23 7:24 10:19 13:20,25 14:4,10,16 15:18,19 29:16 60:12 61:8 62:5 64:25 65:13 75:11 85:19 86:16,24 102:8

**recorded** 14:11 55:4 60:21 61:13 65:18 66:2 71:6 73:4 75:11,19 77:13,20 78:3 86:5 87:23

**recording** 15:18

**records** 15:17 16:25 22:23 26:6 27:23 29:23 40:24 47:1 53:7 60:8 62:1,9 63:20 64:22 69:7,9,20 72:10 101:23 102:13

**RECROSS- EXAMINATION** 124:5

**recruiting** 16:20

**REDIRECT- EXAMINATION** 120:8

**reduce** 14:21 24:20 29:3,9 31:1 33:7,22 60:20 73:8 77:12 78:2 81:7

**reduced** 22:2 24:15 33:5,15 75:11 77:6 78:22 84:1,16 87:14

**reducing** 23:21 24:5, 23 61:13 65:1,4 66:2 77:20 80:8 102:12

**reduction** 21:5 22:11 33:11 62:11,16, 19

**reference** 99:16

**referred** 111:22

**referring** 38:19 55:8

**refers** 68:20

**reflect** 75:20 76:10 114:12

**reflected** 107:11 108:17 109:21

**reflecting** 65:24

**reflective** 72:9

**reflects** 67:24 74:23 86:20

**refresh** 117:23 118:3, 10

**refrigerated** 37:5

**refrigerator** 37:10

**refuse** 41:18,21

**refused** 41:23

**regard** 114:14

**regions** 82:3

**Registered** 5:5

**regular** 37:4 45:4 46:15,16 89:21

**reimburse** 51:25

**reinforce** 16:24

**reinforced** 19:25

**reiterated** 20:6

**related** 107:17

**relates** 61:18 114:3 117:14

**remain** 124:12

MICHAEL S. DINICOLA
MAY 08, 2026

JOB NO. 2707134

**remember** 8:13,20, 22 9:13 13:8,16 16:7, 14,18 22:13 24:10 25:20 29:7,8 33:17 34:4 35:22 36:18 37:16 43:24 45:6 46:24 49:24 50:3 55:13 56:5,16 58:5,6 62:17 71:3 80:1 82:1 84:21 86:11 97:5 110:7,13 111:15 113:13,14,15,17 117:20 119:1

**remembering** 60:23

**reminder** 70:20

**reminding** 102:1

**remote** 6:21 10:16,17 35:6 123:9

**remotely** 7:19

**remove** 50:24 73:16 120:10

**removed** 65:18 71:5 73:3

**repeat** 85:23

**repetitive** 64:24

**rephrase** 11:8 22:24 23:13 28:14 29:13 47:20 56:22 94:7 120:21 121:21 123:6

**rephrased** 6:7

**replace** 25:12

**report** 15:6,12 61:2

**reported** 16:16

**reporter** 5:6,24 6:2,5 13:1 66:22 107:21 125:4,5,11,15,18

**reporting** 9:25 14:22 15:5,11,25

**reports** 67:6 86:4

**represent** 63:18,21 67:21 110:12

**representation** 61:21 71:25 72:8 74:4 75:12

**represented** 60:3 75:10 104:5 117:22

118:8

**request** 86:17 92:25 102:9

**require** 50:19 55:22 125:6

**required** 32:19 36:5 54:3 67:5 108:7 121:13, 20 123:15

**requirements** 56:3 57:8 67:1

**resolve** 28:19

**responsibilities** 20:23 107:16

**responsibility** 14:9 76:24

**responsible** 9:20

**result** 15:19

**retouch** 101:18

**return** 108:7,9 121:13 124:15

**returned** 124:10

**review** 14:15 56:2 80:19,22 101:20 102:20

**reviewing** 22:23

**reviews** 26:12

**revisit** 33:4

**rewards** 88:5

**rights** 68:22,25 114:17 115:15 116:1

**road** 24:12 31:16

**roads** 82:15

**role** 9:19 34:9 79:12

**room** 7:3

**roster** 25:5 88:22

**route** 11:25 12:1 23:9, 10,21 28:3,20,21,24 31:11,12,13,15,18,25 32:1,7,23 38:5 39:22 40:6,10,18,20 48:13 53:3 80:5 83:17 91:3,11 93:11 124:10

**routes** 35:2 52:5 86:13 92:12 97:8 99:1

**routing** 30:11

**RPR** 5:5

**rubric** 57:7

**rules** 92:6

**running** 87:6 115:2

**runs** 115:21

---

### S

**safe** 10:7 37:1 64:21

**San** 19:3

**scaling** 95:8

**scan** 40:12

**scenario** 84:17

**scenarios** 83:20

**scheduled** 32:18 47:3 59:10 64:4 68:9 72:14 73:10 86:4 90:17 105:16 112:3 120:21,23

**schedules** 75:9

**scheduling** 26:25 91:10

**Scholtz** 118:1

**screen** 12:19,21 49:4, 11 63:4 67:16 71:4,18 73:19 94:9 113:7 116:8, 20

**screenshot** 61:16 63:19,21 67:24 72:2,9 74:5 114:12 116:22

**screenshots** 75:8

**seated** 18:15,16

**Seattle** 10:6 27:1 44:1 123:18

**section** 15:15 58:14 76:21

**selected** 112:23 113:1

**selection** 92:23

**seminar** 50:23

**sentence** 13:19 14:8,14 15:8 76:22

**sentiment** 19:25

**separate** 56:25 66:3

**separately** 17:5 54:24

**service** 32:3 107:24

**services** 106:16,20, 24 107:23 108:4 109:22,25

**set** 42:18 51:17 57:13 75:6 92:23 93:2 97:7 104:22 115:16

**sets** 115:4

**setting** 104:15

**shake** 6:4

**share** 21:18 27:14 49:4 60:6 62:24 101:5

**shared** 101:7 116:8

**sheet** 86:6,10

**shift** 11:21 23:22 24:2, 10 28:5 32:21,24 33:5 37:15 48:6 53:1 56:17 57:23 79:2,6,7 83:13,15 90:14,18 91:3,7 93:4 111:24,25 112:2,3,15, 23,24,25 120:19 121:5, 6,9,15,18,20 122:8

**shifts** 26:2,25 92:17 112:14 113:2 120:15,24

**shipping** 99:14

**shock** 99:4

**short** 9:8 110:5

**show** 31:9 46:5,13 87:8,13,18

**showed** 31:20 32:17 75:13 91:16

**showing** 62:21 116:9,19

**shown** 71:1 91:20

**shows** 59:7,10,15 63:17 64:1,7 68:6,13 72:6,11,19 74:10,16

**sick** 32:6

**sign** 119:8

**Signal** 45:2

**similar** 92:13 122:15

**simple** 28:7

**sit** 58:3 105:12

**site** 52:4

**situation** 70:21 83:5, 10

**Skinner** 5:16 106:19 107:1

**skipped** 48:24

**Slack** 16:11 42:11,15 43:12 44:7,9,18 45:8 54:25 61:9 70:2,16,19 98:15 99:8 102:5,10 115:14,19

**software** 30:11,13 38:4,11,13,23,24 39:11

**somebody's** 29:9

**someone's** 75:25

**sound** 27:12 64:24

**southern** 18:24

**speak** 29:24 44:20 85:4 104:13

**specific** 6:20 19:19 21:6,11,16 22:3 23:5 29:21 43:21 45:19,20 58:3 60:2 115:10 116:22

**specifically** 17:13 90:12

**spell** 8:1

**spend** 23:22

**spending** 19:21

**spoke** 33:1 104:17

**spoken** 103:24 104:2,9 106:3,6,11 107:1,4

**spot-check** 28:2

**spreadsheet** 86:23

**spreadsheets** 86:18

**staffing** 27:2

**standards** 79:21

**stands** 80:1

**start** 13:4 24:2 32:24 39:25 48:14 52:25 56:17 94:6 121:8 122:8

**started** 19:3 32:21 35:22,24 39:4 48:11,15, 20 80:6 95:20 98:10

**starting** 40:2 57:22

**starts** 40:6 53:3

**state** 5:7 6:22 7:23 21:5,24 102:7

**stated** 10:14

**statements** 88:19

**Staten** 7:1

**states** 10:9 13:24 15:4,16 82:4

**stayed** 39:7 85:21 86:1

**stealing** 109:18

**Steno** 12:12

**Steno's** 125:10,12

**STINSON-KONSTANTINIDIS** 5:5

**stone** 57:14 92:23 93:2

**stood** 19:20

**stop** 32:5 66:14,19

**store** 12:5 23:23 35:7, 8,12 36:4 48:1

**Stout** 117:23

**Stout's** 123:20

**Stouts** 118:1

**strictly** 32:16

**structures** 17:25

**struggle** 23:25

**stuff** 90:16

**sub-channels** 42:23

**subjected** 92:4

**submit** 53:25 67:5

**submitted** 53:16

**submitting** 14:16

**subpoena** 104:25 105:2,16

**subpoenaed** 100:18

**substance** 7:14

**successful** 108:9 119:17

**suit** 119:5

**supervise** 9:24

**supervised** 9:24

**supervising** 9:20

**supervision** 91:11

**supervisor** 14:15 16:15 18:4 34:10 41:14 75:18 77:4,12 79:13 82:2,6 85:25 89:20 106:14,18,22 107:16 110:8,17,18,20 111:14

**supervisor's** 43:2

**supervisors** 14:21 76:25 85:20 86:3 110:21

**supplemental** 86:17 102:9

**suppose** 35:1 92:22

**supposed** 108:21 124:17

**surprised** 37:17

**sworn** 5:10

**system** 11:1,10,15 33:1 51:4 54:18 55:1,12 56:24,25 57:4 91:21 113:12,20 115:8,9,10, 18 117:21

**systems** 113:18

_____

**T**

_____

**tag** 45:24

**tags** 47:2

**taking** 9:17 65:25

**talk** 26:20,22 115:9

**talking** 26:24 29:15 30:16 115:10

**tampering** 15:17

**targets** 85:22 86:1 87:24

**task** 109:10

**team** 85:21 86:1 87:23 94:15

**Technically** 52:14

**telling** 29:8 119:4

**ten** 66:15 109:3

**terminate** 94:17,22 98:17

**terminated** 17:18 41:25 82:7

**termination** 15:20 94:1 95:3,6 99:18,22

**terms** 61:18 91:10 112:13

**testified** 5:10 78:14 107:13,19 108:15 110:4 111:10 113:9,11 114:15 115:25 118:18

**testify** 6:14 105:2

**testifying** 5:20 120:1

**testimony** 7:21 101:13

**text** 7:7,9 45:4 104:18, 20 105:3,10,19 120:2

**thing** 22:19 83:11 87:7 89:3,7 91:5 101:12

**things** 24:3 26:22,23 67:5 86:13

**thinking** 117:25

**thought** 111:10 119:24

**threatened** 81:2

**three-hour** 11:21 46:21 111:24,25

**Thursday** 68:14

**ticket** 45:12,25 46:7

**tickets** 45:16

**tighten** 95:20

**time** 6:8 8:10,15 11:22 13:20,25 14:5,10,11,15, 22 15:5,11,17,18,19,25 16:25 17:9,12 18:9 19:8,21 21:5 22:2,22,23 23:10,11,21 24:8 25:7 26:5,6 27:23 29:2,4,5, 15,16,20,22,25 30:1,2, 6,17,18,24 31:1,11,17, 24 32:18,25 33:4,7,12, 22 34:12,14,21,23 35:14,19 36:2 38:6 39:13,14 40:13,14 46:13 48:3,15,19 50:22 53:7,8,20 54:5,19 55:4, 6,24,25 59:18 60:21 61:2,18 62:9,16,20 63:20,22 64:10 65:1,9, 14,19 66:2 67:25 68:16 69:8,20,25 70:17 71:6 72:10,15,22 73:5,8,9,10 75:11,19,25 76:6,9 77:13 78:4,7 79:10 80:8 82:12 83:2 84:15,22 86:13 87:12,23 88:7 89:1,14 91:7 95:24 99:6 101:22 102:2,12 106:15,19,23 107:11 108:15,16,20,21,25 109:7,18,21,22 110:5, 11,17,23 111:6,16 112:13,24 114:2,12 116:25 117:20 119:25 120:22 121:23 122:20 124:14

**time-changing** 11:14

**timekeeping** 11:1, 10,15 12:15 13:10 14:4 15:9 20:24 76:18,21 92:6

**times** 11:11,25 28:15 29:1 31:10 44:19 53:13, 21 55:23 75:24 76:3 82:22 90:13,25 93:8 107:9 109:2,13,17 111:21

**timesheet** 58:19 63:1 67:13 71:14 73:20 74:5,10,23 117:11,14

**Timesheet also** 74:16

**tips** 51:16

**title** 16:13,14,18 45:19, 20

**today** 5:17 6:15 62:7 103:19,25 104:7,11 105:18 106:12 116:25 119:25

**today's** 6:21 102:18, 21,25 104:14 105:21,25 111:20

**told** 10:23 21:21,22,24 27:13,15,19 30:3 37:5 70:22 81:5 95:5,7 96:20 100:22,24,25 105:1,14, 15 112:24 114:21,22 115:3 116:3,6 118:2,19 119:1,3,17,22

**tolls** 52:1

**top** 13:9 16:7 37:16 75:21 102:1

**topics** 102:24

**total** 25:2,16 74:23,24 87:2,4,18

**touched** 85:17

**tough** 82:24 98:21

**track** 39:3 42:7,10 45:10 56:13 87:1,4 102:2

**tracker** 40:10

**tracks** 38:5

**trained** 13:13

**training** 19:13,17,20 50:20,23 54:7,8,13,15 56:1,2,3,6,9,14,18,21, 23 57:9,17,24 107:15, 17

**trainings** 19:6 58:4

**transcript** 125:6,20

**travel** 19:5 123:15

**treat** 89:21 91:9

**treated** 90:6

**treatment** 89:11

**truthfully** 5:22 6:14

**Tuesday** 53:20 72:7, 12 74:11

**tunnel** 52:1

**turn** 76:15 103:4

**turned** 74:8 96:25

**type** 36:24 79:11 83:18 108:4

**typed** 65:8

**typical** 69:7,11,23

**typically** 62:10,18

**Tyrone** 5:13 112:6 113:5,22

---

**U**

**Uber** 95:9,11 96:22 97:4,7 98:10

**Uh-huh** 79:19 103:8

**undelivered** 124:9

**understand** 6:6 7:18 18:12,25 65:17 99:3 123:7

**understanding** 58:2,24 108:12,20,24 114:19,20

**unilaterally** 77:12

**United** 10:9 82:4

**unpaid** 100:15

**update** 70:19

**upload** 73:17

**utilization** 89:2

---

**V**

**validate** 14:10

**valued** 97:6

**veer** 32:11

**verify** 61:12

**volunteer** 93:7

---

**W**

**wages** 100:15

**wait** 5:25 10:17 31:14, 25 32:19,22 54:5 109:15

**waiting** 31:10,17,24 52:11,14 54:3

**walk** 109:4,17

**wanted** 66:25 80:2,7, 11 90:5 92:17,18,22 113:2 123:10 124:7

**websites** 44:19

**Wednesday** 68:7 72:20 74:17

**week** 25:22 26:1 28:15 53:25 54:1 74:6 82:24 87:3,8 105:18 123:13

**week-to-week** 87:7

**weekly** 26:20,21,24 43:7 53:11,15,17 69:5 123:4,11

**weeks** 98:25 104:21, 23

**Whatsapp** 44:23

**Wheniwork** 11:1,10, 14 47:16,21 54:18 55:12 56:12,24 57:4,7 59:4 60:8 61:9 62:1 67:25 72:1 74:5 75:9 108:22 113:19 115:12, 14,19 117:17

**Wheniworked** 116:1

**Wilson** 5:15 106:23 107:4

**window** 24:13 39:13 40:13 46:15,16,22 91:1

**withdraw** 57:25

MICHAEL S. DINICOLA
MAY 08, 2026

JOB NO. 2707134

**withdrawn** 106:9

**won** 119:6

**wonky** 58:9

**word** 111:21

**words** 6:4 81:5

**work** 8:11 14:1,5 31:7 32:3 40:14 47:19 50:21 83:16 99:5 115:12,14, 19

**Workday** 115:20

**worked** 13:20 16:22 24:4 50:6 74:11,17 76:25 82:3 90:5 114:21

**worker** 123:9

**workers** 56:9

**workers'** 55:23

**workflow** 99:8

**workforce** 88:21 89:22

**working** 93:16,22 113:15

**written** 58:13 61:8 65:13 77:11 80:23 81:2 82:7 92:5 101:22 125:5

**wrong** 61:10 65:9

## Y

**year** 59:23 60:1,11 98:21 110:13

**years** 111:12

**yellow** 46:6

**yesterday** 46:6

**York** 7:1 9:20 10:5,8 25:3 27:1 31:9 42:20,22 43:25 57:19 70:9 92:18, 22 99:21 109:14 123:11,17

## Z

**Zoom** 16:12 43:19 70:23